**PREFERRED RX, INC., Plaintiff–Appellee, Cross–Appellant,**

v.

**AMERICAN PRESCRIPTION PLAN, INC.; Ray Adiel; Medivix, Inc.; and American Preferred Prescription, Inc., Defendants–Appellants, Cross–Appellees,**

**Ronald English, Defendant.**

**Nos. 93–3769, 93–3835.**

United States Court of Appeals, Sixth Circuit.

Argued Nov. 28, 1994.

Decided Feb. 7, 1995.

Nick Tomino (argued and briefed), Reminger & Reminger, Cleveland, OH, for Preferred RX, Inc.

Marvin L. Karp (argued and briefed), Ulmer & Berne, Cleveland, OH, for American Prescription Plan, Inc., American Preferred Prescription, Inc., Ray Adiel, Medivix, Inc., Ronald English.

Before: MILBURN and SUHRHEINRICH, Circuit Judges; and JOINER, District Judge.*

JOINER, District Judge.

Defendants American Prescription Plan, Inc. ("APP"); American Preferred Prescription, Inc. ("American Preferred"); Medivix, Inc.; and Ray Adiel appeal the judgment entered in favor of plaintiff Preferred RX, Inc., on its breach of contract and fraud claims. Preferred RX claimed that APP breached its agreement to deal exclusively with Preferred RX, and that all of the defendants made fraudulent representations regarding how their business relationship would be conducted. The jury found APP liable for breach of contract and all four defendants liable for fraud. Judgment was entered against defendants jointly and severally for $1,122,643 in compensatory damages

---

* The Honorable Charles W. Joiner, United States District Court for the Eastern District of Michigan, sitting by designation.

and $1 million in punitive damages. Additionally, judgment was entered against Preferred RX on American Preferred's counterclaim in the amount of $61,340.90.

Defendants raise numerous issues, challenging on various grounds both liability and damages, and two defendants challenge the court's personal jurisdiction over them. Preferred RX cross-appeals on two issues, the court's denial of prejudgment interest on the fraud judgment, and the court's decision to compute the amounts due on American Preferred's counterclaim. We affirm in part, reverse in part, and remand.

## I.

APP, a New York corporation and a subsidiary of Medivix, operated a mail order pharmacy licensed by the state of New York. The chairman of Medivix is Ray Adiel. In 1987, Michael Erlenbach and James Frederickson formed Preferred RX with the idea of promoting the benefits of mail order pharmaceutical services to persons with insurance who were required to take prescription drugs on a maintenance basis. Erlenbach and Frederickson had done business with Adiel and APP previously, and enlisted APP to serve as the pharmacy for their new plan.

Under the parties' arrangement, Preferred RX charged each customer an annual membership fee of $25, and obtained from the customer an assignment of benefits which permitted it to bill the customer's insurer directly. In return, Preferred RX "waived" the customer's co-pay obligation under his insurance policy. The customer sent his prescription directly to APP, which filled it and returned it by mail. APP billed Preferred RX for the prescription, charging the average wholesale price. Preferred RX, in turn, billed the insurance company at the retail price, which was 35–40 percent higher than wholesale. The insurance company deducted the applicable co-pay obligation from its reimbursement, and the difference between the

amount received from the insurance company and the amount paid to APP was profit to Preferred RX. Through this arrangement, the customer was spared the task of submitting claims to his insurer, the need to pay for the prescription and wait for reimbursement, and responsibility for the co-pay obligation.

Preferred RX and APP entered into their first contract in November 1987. The contract had a term of one year and provided that "APP shall have the exclusive right to provide mail order prescription services to Sponsor [Preferred RX] during the term of this Agreement." Contract, ¶ 7(d). The parties performed under this contract for nearly a year.[1] APP assigned a computer identification number to all of its customers, and listed Preferred RX's customers as group 194.

In September 1988, APP and Preferred RX entered into a new contract with a two-year term. This contract provided that Preferred RX was to receive a two percent commission on sales of brand name drugs to its members. The contract also imposed an exclusivity obligation on APP by adding the following to ¶ 7(d): "Recognizing the unique nature of Sponsor, APP agrees not to provide prescription services to any other organization structured like Sponsor during the term of this agreement." Erlenbach testified that he and Frederickson wanted to make exclusivity a two-way street, stating that in light of Preferred RX's obligation not to do business with another mail order pharmacy, "we simply asked for the opposite side of the coin, that's okay, you can't do business with another Preferred RX." Frederickson testified that he and Erlenbach were concerned that APP not share Preferred RX's "technology" with another entity, or "develop[ ] their own program and [become] that entity themselves." The 1988 contract remained in force throughout the time period leading up to this suit.[2]

---

1. In practice, the parties' arrangement was altered, though not materially, by the insertion of an administrator, North Coast Physicians, which performed the function of receiving APP's bills, marking up the price and billing the insurance companies, receiving payment and remitting

APP's share to it, and paying the difference, less a service fee, to Preferred RX.

2. In early 1989, Frederickson proposed modifications to the contract, principally to prevent APP from contacting Preferred RX's members for a certain period of time if the contract were

Marketing Directed at AIDS Patients; Ron English

In mid–1988, the availability and high cost of the medication AZT led Erlenbach and Frederickson to propose that they focus their marketing efforts in the AIDS community. Adiel introduced Erlenbach to Ron English, described as a New York philanthropist with connections in the gay community. Erlenbach proposed that English assist in marketing Preferred RX. English agreed, but did not want to sign a contract with Preferred RX. Instead, Preferred RX and English entered into an oral arrangement, whereby Preferred RX agreed to pay English a two percent commission on sales generated by him as well as a portion of the $25 fee paid by its customers. Preferred RX agreed to send the commission to APP for forwarding to English, but paid the portion of the fee directly to English. Although Adiel later informed Erlenbach that APP and English had entered into a written contract, Erlenbach did not know its terms until after this action was filed. By that contract, APP engaged English as an agent to market its services, and agreed to pay him a two percent commission on the sales he generated.

In October 1988, APP issued a memorandum to its customer service personnel, sending a copy to Preferred RX, instructing them that when a call regarding Preferred RX or Ron English or Ron came in, the caller was to be referred to Preferred RX at its 800 number. English secured the publication of an article in an AIDS magazine about the benefits of mail order pharmacy services, in which Preferred RX's name and phone number were listed. Preferred RX's business with AIDS patients increased significantly after the article was published.

Group 203; APP's Direct Marketing

Within months of entering into the second contract with Preferred RX, APP decided to begin direct marketing of its business. A meeting was held in November 1988 at Adiel's home at which Adiel, his wife Eleanor,

APP's president Uri Kollnesher, and two APP employees were present. The employees testified that Adiel told them that APP was going to market its services directly to AIDS patients in a manner similar to Preferred RX's operations. Adiel explained that APP would obtain an assignment of benefits from customers, using Preferred RX's form as an example, and then bill the insurance companies directly. The employees also were told that new customers responding to these marketing efforts would be entered as group 203 in APP's computer. The employees were instructed to refer phone calls from new customers, including those resulting from English's efforts to Eleanor Adiel, and further were told that they were not to disclose the existence of group 203 to Erlenbach. Adiel acknowledged that a meeting was held at his home, but denied participating in it. Eleanor Adiel testified that group 203 was not comprised solely of AIDS patients but, rather, all persons with insurance. APP hired an employee to manage insurance billing, because the company previously had not billed insurance companies directly.

In early 1989, Adiel and Kollnesher approached Erlenbach, stating that English wanted a change in the parties' operating procedure. They explained that English was concerned that he could not verify that he was given credit for all of the business that went directly to Preferred RX, and said that he wanted calls to be referred first to APP so that a record could be kept of the sales generated by him. To accommodate English, Preferred RX agreed that promotional material would list only APP's name, or American Preferred Plan, the name under which the business sometimes was marketed. Erlenbach was told that APP would take each new customer's name and number, and then refer him or her to Preferred RX. Adiel denied that these representations were made.

APP's promotional materials subsequently made no reference to Preferred RX, and an

terminated for some reason. Frederickson's proposal included an addition to the exclusivity clause preventing APP from providing prescription services with "any other organization structured like or *doing business like*" Preferred RX.

(Emphasis added.) Frederickson testified that he intended no substantive change by this language, and the proposal was not accepted by APP.

article published in 1989 through English's efforts was similarly silent. Erlenbach testified that he and Frederickson were not concerned by this because they had been assured that APP would refer all calls from customers with insurance to Preferred RX. Erlenbach testified that Preferred RX stopped marketing in the AIDS community based upon these assurances. However, Preferred RX did not receive many new customers after its name was omitted from the marketing materials. Erlenbach questioned this with Adiel and Kollnesher, and was told that they too were concerned, and that the market simply could be slow in developing. Adiel again denied that these representations were made.

### American Preferred Prescription, Inc.

Adiel testified that APP was in financial difficulty throughout this time period and could not obtain credit through conventional sources. Adiel approached Michael Kollnesher, Uri Kollnesher's father, for financial assistance, as he had on behalf of Medivix on other occasions. Michael Kollnesher arranged to have a foreign company, Hadiya Holding, Inc., form a subsidiary, American Preferred Prescription, Inc. American Preferred provided APP with credit, and Adiel personally guaranteed the loans.

American Preferred was incorporated in New York in November 1988, and had two officers/employees, neither of whom had any personal involvement in the events giving rise to this case or in the trial itself. In January 1989, American Preferred entered into a written contract with APP, pursuant to which American Preferred agreed to purchase the inventory to enable APP to meet its obligations. APP, in turn, agreed to invoice and collect payment on American Preferred's behalf, and to deposit all receivables directly into American Preferred's designated bank account. To secure its position, American Preferred took an assignment of APP's equipment, and also requested an assignment of accounts receivables. Kollnesher requested that Preferred RX assign its "receivables" to American Preferred, and Preferred RX did so, subject to the 1988 contract.

Adiel testified that to further protect its interests, American Preferred took title to all of APP's pharmaceutical inventory in mid–1989. Adiel testified that New York law required that American Preferred become a licensed pharmacy to own prescription drugs. American Preferred applied for a transfer of ownership in May 1989, which was granted in July. APP then ceased being a licensed pharmacy, and limited itself to operating the pharmacy that was now owned by American Preferred. Erlenbach testified that they were unaware of this change, although Adiel testified that announcements were sent out to all sponsors, including Preferred RX.

### Termination

In October 1989, Erlenbach attended a trade show in San Francisco and saw APP's booth. Erlenbach concluded at that point that APP was competing with Preferred RX. Erlenbach and Frederickson formed their own pharmacy, which became operational in December 1989. Preferred RX then cancelled its contract with APP, directed its members to send their prescriptions to the new pharmacy, and filed this action.

## II. Defendants' Appeal

### A. Contract Issues

#### Liability

Preferred RX alleged that APP breached its exclusivity obligation, as set forth in ¶ 7(d) of the 1988 contract, by doing business with group 203, which, it claimed, constituted an "other organization structured like" Preferred RX. APP moved for judgment as a matter of law, contending that it was not liable for breach and urging a restrictive interpretation of ¶ 7(d). The court denied the motion and submitted the contract claim to the jury, which found that APP breached the contract and that Preferred RX suffered lost profits of $1,122,643. Following trial, APP again moved for judgment as a matter of law, contending that the contract language was unambiguous and that the claim should not have been submitted to the jury. Alternatively, APP contended that the evidence was insufficient to support the jury's verdict. The trial court disagreed on both points. APP reiterates these argu-

ments on appeal.[3] We conclude that the court correctly determined that the contract was ambiguous and thus properly submitted the claim to the jury, and that the evidence was sufficient to support the jury's verdict.

■ The contract provided that it was to be governed by New York law, a point agreed upon by the parties. Under New York law, whether a contract is ambiguous is a question of law for the court, *Sayers v. Rochester Telephone Corp. Supplemental Management Pension Plan,* 7 F.3d 1091, 1094 (2d Cir.1993), which this court reviews de novo. *Construction Interior Sys., Inc. v. Marriott Family Restaurants, Inc.,* 984 F.2d 749, 754 (6th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 194, 126 L.Ed.2d 152 (1993). Contract language is ambiguous if it is " 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.' " *Walk–In Medical Ctrs., Inc. v. Breuer Capital Corp.,* 818 F.2d 260, 263 (2d Cir.1987) (quoting *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.,* 284 F.Supp. 987, 994 (S.D.N.Y.1968)). Conversely, contract language is *un*ambiguous if it has " 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.' " *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.,* 906 F.2d 884, 889 (2d Cir.1990) (quoting *Breed v. Insurance Co. of N. Am.,* 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978)). "Where reasonable minds could be said to differ because the language the parties used in their written contract is susceptible to more than one meaning ... and where extrinsic evidence of the parties' actual intent exists, it should be submitted to the trier of fact." *Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 573 (2d Cir.1993).

The operative language of the exclusivity clause prohibited APP from providing prescription services to "any other organization structured like" Preferred RX. This language does not have a definite and precise meaning, and, therefore, there is a reasonable basis for a difference of opinion regarding its interpretation. The phrase speaks in terms of an organization, but does not limit the type of entity that term encompasses. A standard dictionary definition of "organization" is "an administrative and functional structure (as a business or a political party)." *Webster's Ninth New Collegiate Dictionary* 831 (1985). This sweepingly inclusive language is not susceptible of an interpretation which would limit its breadth in any meaningful way. The other, and arguably more concrete, requirement is that the organization be "structured like" Preferred RX. However, the aspects in which the organization must resemble Preferred RX are not set forth. Reasonable minds could differ on whether the organization must have a corporate structure like that of Preferred RX, or simply must function in a similar manner, as did group 203, by obtaining assignments of benefits, directly billing insurance companies at retail prices, and waiving the customers' co-pay obligations. In sum, the language at issue is clearly capable of more than one meaning, and the district court correctly concluded that the contract was ambiguous under New York law and submitted the issue to the jury.

■■ The next question is whether there was sufficient evidence to support the jury's finding of breach. We look to New York law's standard for reviewing a motion for judgment as a matter of law or judgment notwithstanding the verdict. *Construction Interior Sys.,* 984 F.2d at 753. Under New York law, the question is whether the verdict could not have been rendered by any fair interpretation of the evidence, and a verdict will not be set aside unless it is "utterly irrational." *Farrell v. Stafford Mach. Corp.,* 205 A.D.2d 951, 613 N.Y.S.2d 766 (1994). Under this standard, there can be no question but that the jury's verdict is supported

---

**3.** Preferred RX contends that APP waived its argument that the contract claim should not have been submitted to the jury because it did not raise this specific challenge in its motions for judgment as a matter of law. We need not reach this issue due to our rejection of APP's claim that the contract was unambiguous.

by sufficient evidence. The jury was entitled to consider extrinsic evidence of the parties' intent to determine the meaning of the contract language, and it is significant that Frederickson testified that they requested an exclusivity commitment from APP in part because of a concern that APP might utilize Preferred RX's technology and form its own entity to compete with Preferred RX. Further, based on the numerous points of similarity between APP's operation of group 203 and the manner in which Preferred RX structured its business, the jury was entitled to conclude that APP breached its exclusivity obligation.

### Damages

Preferred RX calculated its damages based on APP's group 203 sales from January 1989 through September 1990, $9,787,650; and multiplied that number by Preferred RX's percentage of profit, for a subtotal of $926,890. Added to this was a two percent commission on the sales, $195,753, for a total of $1,122,643. The jury found lost profits in this amount. APP challenges the jury's award on several grounds.

■ First, APP contends that New York law required Preferred RX to prove that had APP not made the sales at issue, Preferred RX would have done so. APP relies on *Bausch & Lomb, Inc. v. Bressler*, 977 F.2d 720, 728 (2d Cir.1992), where the court noted that the district court had denied as speculative damages sought in a breach of an exclusive distributorship agreement, on the ground that the plaintiff had not demonstrated that it would have made the same sales if the defendant had not competed with it. However, APP failed to move for judgment as a matter of law on this issue prior to the submission of the case to the jury, and is thus precluded from challenging the sufficiency of the evidence in support of the verdict. *Libbey–Owens–Ford Co. v. Insurance Co. of N. Am.*, 9 F.3d 422, 426 (6th Cir.1993). Moreover, APP's reliance on *Bausch & Lomb* is misplaced. In that case, the defendant

secretly competed with the plaintiff, and its breach was in diverting business that arguably would have gone to the plaintiff had it not competed. The plaintiff thus was required to prove that it would have made the sales made by the defendant. However, APP's breach was not simply in competing with Preferred RX, but also in not giving Preferred RX credit for the sales made through that competition. Based on this evidence, the jury was entitled to conclude that Preferred RX's lost profits were those based on the sales wrongfully made by APP.

■ APP next challenges the inclusion of a two percent commission, contending that Preferred RX should not have been awarded amounts that Preferred RX was obligated to pay to Ron English pursuant to its oral arrangement with him. The short answer to APP's argument is that Preferred RX's obligation to English is a matter distinct from APP's obligation to Preferred RX. The contract between Preferred RX and APP entitled Preferred RX to the commission, and that contract was not modified to eliminate this obligation.[4] APP's challenge has no merit.

■ APP argues that the period for which damages were awarded erroneously included the time after which Preferred RX terminated the contract and did business through its own pharmacy, contending that Preferred RX simply is not entitled to damages for this period. However, New York law entitles a party to "expectation damages," those which place it in the position it would have occupied if both parties had fully performed. *Bausch & Lomb*, 977 F.2d at 728–29. Had APP fully performed, Preferred RX would not have been required to strike out on its own, and the contract would have continued until its September 1990 expiration date. APP alternatively argues that the damages for this period must be reduced by the amount of profit it would have earned if the contract had continued, i.e., if *it* had been the participating pharmacy. We disagree. The jury was instructed on the con-

---

**4.** APP appears to argue that it was obligated to pay English a two percent commission on sales generated by him, and therefore is entitled to deduct that payment from amounts owing to

Preferred RX. However, English testified at trial that he severed his relationship with APP and Adiel because they had not paid his commissions.

cept of mitigation of damages, and, based on its award, determined that Preferred RX would have made the post-termination sales in addition to being entitled to credit for group 203's sales. APP's breach put Preferred RX in the position of having to find an alternative pharmacy, and the fact that Preferred RX operated through an affiliated company rather than an independent company is irrelevant, because Preferred RX would have earned its profit regardless.

In sum, we find no basis on which to disturb the jury's verdict on the breach of contract claim, and affirm that portion of the judgment.

## B. Fraud Issues

Preferred RX's fraud claim was brought against Ron English as well as the four defendants who are parties to this appeal. The jury found all defendants except English liable for fraud and for punitive damages.[5] Under Ohio law, the court was responsible for setting the amount of punitive damages, and awarded $1 million. Defendants attack the fraud judgment piecemeal. American Preferred alone asserts that the evidence supporting the jury's finding of liability is insufficient. All four defendants challenge the computation of Preferred RX's fraud damages, and, based on that argument, contend that the court's punitive damage award cannot stand. Defendants also request remand for a jury trial on the amount of punitive damages for which they are liable. Finally, Adiel and Medivix challenge the district court's personal jurisdiction.

### American Preferred's Liability for Fraud

American Preferred moved for judgment as a matter of law, contending that there was no evidence upon which the jury could find it liable for fraud in accordance with Preferred RX's allegations and the instructions. The court denied its motion, stating that there was evidence that Adiel controlled American Preferred and used it as a means to defraud Preferred RX, and further, that American Preferred concealed the "switch" in July

1989 when it became the operating pharmacy. Based on this, the court held that there was evidence to conclude that a fraud was committed, and upheld the jury's verdict.

Preferred RX's cause of action for fraud was submitted to the jury on the claim that defendants made false representations or wrongfully failed to disclose the facts regarding the actual reason for requesting Preferred RX to pay English's commissions through APP; the reason for the 1989 change in advertising for new customers, so that they would call APP directly rather than Preferred RX; the reasons for the decline in growth of new members after January 1989; and the procedures for referring calls from prospective customers. The jury charge instructed that Preferred RX must prove that each defendant knowingly made a false statement of fact or concealed a fact material to the transaction, knowing that it was false, and with the intention that Preferred RX rely on it.

Based on Preferred RX's claims and the instructions given to the jury, there is no evidentiary basis for the fraud judgment against American Preferred. It is undisputed that at all times prior to the filing of this lawsuit, American Preferred Prescription was a wholly owned subsidiary of Hadiya Holding and had two officers/employees. Neither Frederickson nor Erlenbach testified that they had conversations with these employees or with representatives of Hadiya Holding. Thus, there is no evidence that American Preferred itself made fraudulent representations to Preferred RX.

Nor is there evidence that Adiel controlled American Preferred at the time period relevant to this case. Indeed, the testimony and inferences that can be drawn therefrom are to the contrary. Adiel testified that American Preferred loaned between $1 and $2 million to APP during 1989, and that he personally guaranteed the loans, secured by stock he owned in another company. Adiel further testified that in 1990, five months *after* the lawsuit was filed, American Pre-

---

**5.** The parties are silent on appeal as to whether New York law or Ohio law governs the fraud claim. The district court applied Ohio law, a decision supported by Ohio's choice of law rules, and the Restatement (Second) of Conflicts, on which they are based. *Morgan v. Biro Mfg. Co.*, 15 Ohio St.3d 339, 474 N.E.2d 286, 288–89 (1984); Restatement § 148(2).

ferred's employees resigned so as not to become embroiled in the litigation, and the holding company requested that American Preferred either be liquidated or sold. At *that* point, Adiel purchased American Preferred's stock and became its owner and chairman.

The question of American Preferred's liability, then, turns on whether it concealed a material fact from Preferred RX. Ohio's rules on a party's duty to speak are summarized in *Miles v. McSwegin*, 58 Ohio St.2d 97, 388 N.E.2d 1367, 1369 (1979):

> [A]n action for fraud and deceit is maintainable not only as a result of affirmative misrepresentations, but also for negative ones, such as the failure of a party to a transaction to fully disclose facts of a material nature *where there exists a duty to speak.* Moreover, it should be axiomatic that parties who directly benefit from *and knowingly participate in* a transaction tainted with fraud or deceit, *who are under a duty to disclose their knowledge* and fail to do so, are liable for damages directly and proximately resulting from their silence.
>
> [A] party is under a duty to speak, and therefore liable for non-disclosure, if the party fails to exercise reasonable care to disclose a material fact which may justifiably induce another party to act or refrain from acting, *and the non-disclosing party knows that the failure to disclose such information to the other party will render a prior statement or representation untrue or misleading.*

(Emphasis added; citations omitted.)

As noted, the jury was instructed that Preferred RX's fraud claim was based on four categories of information, all concerning APP's diversion of sales from Preferred RX, as to which Preferred RX was either actively misled or not provided accurate information. There is no evidence that American Preferred knew that Preferred RX had been

given false information regarding APP's scheme or that it participated in the scheme. At the point that APP and Adiel put the scheme into effect, American Preferred had no relationship with Preferred RX from which a duty to speak can be inferred. *See Central States Stamping Co. v. Terminal Equip. Co.*, 727 F.2d 1405, 1409 (6th Cir. 1984).

On the record before us, the only fact which American Preferred might have had an independent duty to disclose did not exist until July 1989, when American Preferred succeeded to APP's status as the pharmacy, and undertook to perform APP's obligations under its contract with Preferred RX. That contract provided that "neither party may assign any of its rights or delegate any of its duties hereunder without the prior written consent of the other party which consent shall not be unreasonably withheld." As assignor, APP unquestionably had a duty to disclose the assignment to Preferred RX, but American Preferred's duty is not so clear. More importantly, even if American Preferred breached a duty to disclose the assignment, this was not the basis for Preferred RX's fraud claim, as explained to the jury in the instructions. We cannot sustain the verdict based upon a claim on which the jury was not asked to pass.[6]

We may reverse the denial of a motion for judgment as a matter of law in a case where Ohio substantive law governs only if "there can be but one reasonable conclusion as to the proper verdict." *Potti v. Duramed Pharmaceuticals, Inc.*, 938 F.2d 641, 645 (6th Cir.1991). We are persuaded that this is such a case, and that the verdict against American Preferred must be reversed.

#### Damages

The fraud claim was submitted to the jury on interrogatories which required the jury to

---

**6.** On appeal, Preferred RX contends that the purpose of American Preferred as of July 1989 and after was to be the repository for the funds which APP wrongfully diverted from Preferred RX, so that they would be beyond the reach of Preferred RX. As argued, Preferred RX's claim more closely resembles one for fraudulent conveyance or fraudulent transfer, a cause of action which Ohio law recognizes, but which has elements distinct from the common law fraud claim presented to the jury in this case. *See* Ohio Uniform Fraudulent Transfer Act, Ohio Rev.Code Ann. §§ 1336.01 *et seq.* (Anderson 1993); *United States v. Berman*, 884 F.2d 916 (6th Cir.1989) (decided under former § 1336.07).

determine whether each defendant was liable for fraud and for punitive damages, but did not require the jury to determine the amount of damages resulting from the fraud. Rather, the general verdict form had one entry for compensatory damages, and the jury was instructed to enter there the amount it determined to be Preferred RX's lost profits resulting from breach of contract. The court entered judgment against all four defendants jointly and severally in this amount on the jury's fraud verdict.

During the conference regarding the instructions and interrogatories, defense counsel initially argued that the damages resulting from defendants' alleged fraud were distinct from the damages resulting from the breach of contract. The court disagreed, stating its view that the damages for breach of contract and fraud were the same because defendants' fraud was alleged to have caused the breach of contract, and that "[t]hese are the things that caused the breach. It's nothing separate." Counsel responded "okay," and did not state that he adhered to his position. Defense counsel suggested to the court that the instructions should be conformed to the interrogatories as the court determined they would be presented. The charge as given instructed the jury to enter on the verdict form as compensatory damages the amount of damages found for breach of contract. After the court delivered the charge, plaintiff formally asserted its objections, but defense counsel was silent.

It is readily apparent that the court's damage analysis offered defendants a potential benefit. Concluding that plaintiff's causes of action were related, the court stated that, if the jury were to find that no breach of contract occurred, plaintiff would not be entitled to damages for fraud. Preferred RX did not object to this approach, and the jury ultimately was instructed to proceed no further if they found no breach of contract. Defense counsel reasonably could have anticipated that a further challenge to the court's analysis could have eliminated the chance of prevailing on the fraud claim if the jury rejected the contract claim. Nonetheless, defendants now claim that the court erroneously refused to require the jury to find the amount of damages resulting from the fraud. The district court denied defendants' post-judgment motion on this issue, concluding that they had agreed to the submission of the fraud claim to the jury without such an interrogatory, and concluding further that the damages for breach of contract and fraud were identical in any event.

■ Pursuant to Fed.R.Civ.P. 51, "[n]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection."

> The law in this circuit generally requires a formal objection, which should in most circumstances be made both before and after the jury instructions are read to the jury. An exception to this rule occurs *only* when it is plainly apparent from the discussion between the parties and the judge that the judge was aware of a party's dissatisfaction with the instruction, as read to the jury, and the specific basis for that claimed error or omission.

*Woodbridge v. Dahlberg*, 954 F.2d 1231, 1237 (6th Cir.1992) (citations omitted; emphasis added). The rule reiterated in *Woodbridge* is not a "mere formality," but was developed to fulfill the basic purpose of Rule 51; that is, to alert the trial judge to potential problem areas so that the jury can be clearly and correctly instructed. *Murphy v. Owens–Illinois, Inc.*, 779 F.2d 340, 346 (6th Cir.1985). "This purpose is well understood by the courts and the rule is applied in light of it. The necessity of a retrial is avoided when, by design or through sheer neglect, the losing party fails to make objection at the proper time." Charles A. Wright & Arthur Miller, Federal Practice and Procedure § 2551 at 383–84 (1995) (footnotes omitted). Thus, it must be clear, if no objection is made to an instruction after the jury is charged, that the trial judge knew both that the party in fact objected to the instruction and the basis for that objection. This is not, unfortunately, what occurred here.

■ The trial judge in this case plainly understood defense counsel to have agreed that the fraud damages did not differ from

**54**

contract damages, an understanding based on counsel's conduct at the charge conference and counsel's failure to object after the charge was given. Even though defendants' principal quarrel is with the interrogatories rather than the charge itself, their obligation to formally object and state their position was not lessened. Defense counsel's failure to comply with *Woodbridge* and Rule 51 results in a waiver of the objection advanced on appeal, and the jury verdict can be reversed only for plain error. *Woodbridge*, 954 F.2d at 1237.

We do not find plain error here. The district court correctly observed that defendants' fraudulent representations caused the breach of the contract and Preferred RX's resulting damages. Thus, the damages proximately caused by defendants' fraud and APP's breach of contract were the same. Simply put, no obvious and prejudicial error occurred in the court's damage analysis which requires appellate intervention. *Murphy*, 779 F.2d at 346.

Finally, we turn to defendants' liability for punitive damages. Defendants claim that Preferred RX did not prove compensatory damages resulting from fraud, and therefore is not entitled to punitive damages. We have rejected defendants' challenge to compensatory damages, and thus are not presented with any basis on which to disturb the jury's finding that defendants are liable for punitive damages.

In accordance with Ohio Rev.Code Ann. § 2315.21(C)(2) (Anderson 1991), the district court submitted to the jury the question whether defendants were liable for punitive damages under Ohio law, and reserved to itself the determination of the *amount* of damages to which Preferred RX was entitled. At no time have defendants claimed that the court's award was excessive or otherwise contrary to Ohio law. Following oral argument in this case, the Ohio Supreme Court

decided *Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552, 644 N.E.2d 397 (1994), holding that the statutory requirement that the court determine the amount of punitive damages is unconstitutional under Section 5, Article I of the Ohio Constitution. In light of *Zoppo*, defendants now request that the case be remanded for a jury determination of the amount of punitive damages for which they are liable.

As noted, Preferred RX's fraud claim was added by way of the amended complaint. Although Preferred RX demanded a jury trial upon its amended complaint, that pleading specifically alleged that Preferred RX was "entitled to an award of punitive damages against the defendants *in an amount to be determined by this court in accordance with Ohio Revised Code § 2315.21.*" (Emphasis added.) Defendants did not file a jury demand on this issue in response to the amended complaint, and did not at any time thereafter make a claim that they were entitled to have the jury determine the amount of punitive damages. They did not object to the court's failure to submit this issue to the jury, or argue in response to Preferred RX's motion for the court's determination of the amount of punitive damages that they had been denied their right to a jury trial. The first time this issue was raised was in *this* court, *after* oral argument, and after the Ohio Supreme Court's decision in *Zoppo*.

The right to trial by jury, even though grounded in both federal and state constitutional provisions, is a right subject to waiver. Fed.R.Civ.P. 38, 39; *Sewell v. Jefferson County Fiscal Court*, 863 F.2d 461, 464 (6th Cir.1988), *cert. denied*, 493 U.S. 820, 110 S.Ct. 75, 107 L.Ed.2d 42 (1989). The right to a jury trial may be waived by the conduct of the parties, and the courts of appeal to have considered the issue have held that a party waives any right it may have to trial by jury by participating without objection in a bench trial.[7] Other parties in com-

---

7. *Root v. Consolidated Freightways Corp.*, No. 86–6149, 1987 WL 24092, at *1, 1987 U.S.App. LEXIS 15721, at *4 (6th Cir. Dec. 1, 1987) ("The right to a jury also may be waived by failing to object to a bench trial and subsequently fully participating in the trial."). *Accord Lend Lease Trucks, Inc. v. Mays*, No. 93–5950, 1994 WL

28667, 1994 U.S.App. LEXIS 1820 (6th Cir. Jan. 31, 1994); *FMC Corp. v. Aero Indus., Inc.*, 998 F.2d 842, 845 (10th Cir.1993); *Cooper v. Loper*, 923 F.2d 1045, 1049 (3d Cir.1991); *White v. McGinnis*, 903 F.2d 699 (9th Cir.) (en banc), *cert. denied*, 498 U.S. 903, 111 S.Ct. 266, 112 L.Ed.2d 223 (1990); *Royal American Managers, Inc. v.*

pletely independent litigation have persuaded the Ohio Supreme Court that § 2315.21 is unconstitutional. However, the fact that the court did not rule until this appeal was submitted for decision does not excuse defendants' failure to assert *their* rights and objections in a timely manner.

■ Independent of defendants' waiver of any claim of right to a jury trial, their belated request for remand runs afoul of the general rule that, subject to limited exceptions, this court will not consider issues not presented to the district court but raised for the first time on appeal. *Foster v. Barilow,* 6 F.3d 405, 407 (6th Cir.1993). *See also FDIC v. Massingill,* 24 F.3d 768, 778–79 (5th Cir.), *modified in part on other grounds,* 30 F.3d 601 (5th Cir.1994); *Heritage Mut. Ins. Co. v. Haas,* Nos. 16488, 16571, 1994 WL 433113, 1994 Ohio App. LEXIS 3580 (Ohio App. Aug. 10, 1994) (party who waived right to trial by jury could not challenge constitutionality of § 2315.21(C)(2) on appeal). An appellant " 'may not now deny that it waived its right to a jury trial and demand a new trial only after it has lost on the merits and failed to make a timely objection before the district court.' " *Massingill,* 24 F.3d at 779 (quoting *Molett v. Penrod Drilling Co.,* 826 F.2d 1419, 1424 (5th Cir.1987)).

We conclude that defendants waived any claim of right to a jury trial on the amount of punitive damages, and further that their failure to raise this issue in the district court precludes them from asserting it at this late date.

Personal Jurisdiction Over Adiel and Medivix

Defendants Adiel and Medivix contend that the record does not reflect that they had sufficient contacts with Ohio to justify the court's exercise of personal jurisdiction over them with respect to Preferred RX's fraud claim. We conclude that defendants waived this argument.

*IRC Holding Corp.,* 885 F.2d 1011, 1018 (2d Cir.1989); *United States v. 1966 Beechcraft Aircraft Model King Air A90,* 777 F.2d 947, 950–51 (4th Cir.1985).

**8.** Section 2307.38.2(A)(6) provides that jurisdiction may be exercised over a person as to a cause of action arising from the person's:

Preferred RX's original complaint alleged only breach of contract and tortious interference with contract. Adiel and Medivix, named only in the latter count, moved to dismiss this complaint for lack of personal jurisdiction under the Ohio long-arm statute, Ohio Rev.Code Ann. § 2307.38.2 (Anderson 1991), contending that they had neither transacted business in the state nor contracted to supply services or goods in the state, within the meaning of subsections (A)(1) and (A)(2) of the statute. Preferred RX responded, contending that the court had personal jurisdiction over Adiel and Medivix under subsection (A)(6) of the statute [8] because they had caused tortious injury to Preferred RX in Ohio by acts committed outside Ohio. Preferred RX's arguments and the affidavits in support were tailored to the claim of tortious interference with contract, and alleged that defendants had made phone calls to Erlenbach in Ohio and had solicited business rightfully belonging to Preferred RX from Ohio customers. Adiel and Medivix replied, arguing that their contacts with Ohio were insufficient to confer jurisdiction on the court. Significantly, Adiel and Medivix contended that jurisdiction over them could not be exercised because "there is no claim that defendants ... induced plaintiff to do *anything* or that the 'phone conversations' caused any damage whatever to plaintiff."

The court denied defendants' motion by marginal entry order, and Adiel and Medivix answered the complaint, raising lack of personal jurisdiction as a defense. Shortly thereafter, Preferred RX filed an amended complaint, adding in a separate count and as a separate cause of action and claim for relief, a claim for fraud. Adiel and Medivix filed a new answer to the amended complaint, but did not at that time challenge the court's personal jurisdiction over them as to the fraud claim, or in any way alert the court

(6) Causing tortious injury in this state to any person by an act outside this state committed with the purpose of injuring persons, when he might reasonably have expected that some person would be injured thereby in this state....

to the argument now raised on appeal that there was no personal jurisdiction over them as to the new fraud claim.

■ The defense of lack of personal jurisdiction is waived if omitted from a motion to dismiss under Fed.R.Civ.P. 12, or if not made by motion or included in a responsive pleading. Fed.R.Civ.P. 12(h). Adiel and Medivix contend that their first motion to dismiss satisfied their obligation to raise lack of personal jurisdiction, and that they were not required to assert the defense thereafter. On this record, we are compelled to disagree.

■ Long-arm jurisdiction, unlike general jurisdiction, exists only as to causes of action arising out of the particular contacts on which jurisdiction is based. This limitation is necessitated by due process:

> Whether due process is satisfied must depend ... upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure. That clause does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties, or relations.
>
> But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations, and, *so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue.*

*International Shoe Co. v. Washington,* 326 U.S. 310, 319, 66 S.Ct. 154, 160, 90 L.Ed. 95 (1945) (citations omitted; emphasis added). The Ohio long-arm statute was drafted with these principles in mind, extending to the limits of due process. *In–Flight Devices Corp. v. Van Dusen Air, Inc.,* 466 F.2d 220, 224–25 (6th Cir.1972). The statute expressly provides that the exercise of jurisdiction is limited to causes of action arising out of the acts enumerated therein. Ohio Rev.Code § 2307.38.2(C).

■ Defendants' motion to dismiss for lack of personal jurisdiction required the district court to assess their contacts with Ohio in relation to only the claim of tortious interference with contract. The court denied this motion, and was never asked to determine whether it had jurisdiction over these defendants in connection with the fraud claim. The torts of tortious interference with contract and fraud define distinct wrongs, and have no elements in common. The tortious interference claim required Preferred RX to prove that APP breached the contract; that each defendant was aware of the particular provisions that were breached; that each defendant knew that the actions it requested of APP would result in breach; and that each defendant purposefully and intentionally induced APP to breach the contract. The fraud claim, by way of contrast, required proof that the defendants knowingly and intentionally made misrepresentations or concealed material facts, with the intention that Preferred RX rely on the misrepresentations or concealments. Both claims were submitted to the jury, and the jury found for defendants on the tortious interference claim and against defendants on the fraud claim.

In light of the "arising out of" limitation inherent in determining long-arm jurisdiction and the distinct nature of the two tort claims asserted by Preferred RX, defendants' claim that their contacts with Ohio were insufficient for the court's exercise of jurisdiction over them with respect to the tortious interference claim was inadequate to challenge the court's jurisdiction with respect to the fraud claim. Defendants contend that the fraud claim simply added another alleged instance of tortious conduct occurring outside Ohio as to which jurisdiction would be predicated on Ohio Rev.Code § 2307.38.2(A)(6). Considerations of convenience and judicial economy would "suggest a common forum for all claims arising from a common factual pattern," *In–Flight,* 466 F.2d at 228–29 n. 16, a factor which weighs against defendants' isolated jurisdictional challenge to Preferred RX's fraud claim. Nonetheless, the "arising out of" requirement must be considered sep-

arately for each cause of action asserted by a plaintiff. *Id.* at 228. Thus, *if* a proper motion had been filed, or *if* the answer filed after the fraud claim was added had asserted lack of personal jurisdiction as a defense, Preferred RX would have had to demonstrate to the trial court that defendants engaged in activities justifying the exercise of jurisdiction, and that its fraud claim arose out of those activities. The facts supporting a fraud claim and a tortious interference claim were not identical, and the contacts on which jurisdiction could be premised for the two torts were not identical. In responding to defendants' motion, Preferred RX understandably focused on defendants' interference with its contract rights, and did not raise or even allude to defendants' fraudulent misrepresentations. Defendants rely on this omission in making their jurisdictional challenge on appeal. However, it was defendants' failure to raise this challenge in the district court which prevented plaintiff from fully articulating its position and which caused the record on appeal to be incomplete.

■ We need not assert that an amended complaint always requires a defendant to raise anew a challenge to personal jurisdiction. We only state that where, as here, the amended complaint adds a new cause of action, jurisdiction as to which reasonably may be premised on different contacts or conduct, a defendant wishing to make a jurisdictional challenge to the new claim must assert the defense as required by Fed.R.Civ.P. 12(h).[9] Failure to do so results in waiver.

### III. Plaintiff's Cross–Appeal

#### A. Denial of Prejudgment Interest

Preferred RX moved for prejudgment interest on the jury's fraud award pursuant to Ohio Rev.Code Ann. § 1343.03(C) (Anderson 1993), which provides that prejudgment interest may be awarded on a tort judgment if the court determines "that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case." Preferred RX contended that defendants did not make a good faith effort to settle the case because they made no settlement offer prior to trial, and, after trial, offered only $200,000. The court denied the motion by marginal entry order, and Preferred RX appeals.

■ An award of prejudgment interest is committed to the trial court's discretion, and we review for abuse of discretion. *Stallworth v. Cleveland,* 893 F.2d 830, 835 (6th Cir.1990); *Kalain v. Smith,* 25 Ohio St.3d 157, 495 N.E.2d 572 (1986). A plaintiff's entitlement to prejudgment interest depends on how aggressively it pursued settlement, *Sindel v. Toledo Edison Co.,* 87 Ohio App.3d 525, 622 N.E.2d 706 (1993) (statute requires party seeking prejudgment interest to demonstrate aggressive prejudgment settlement efforts); and on whether the defendant has failed to make a good faith effort to settle. A party has not failed to make a good faith effort to settle if he has (1) fully cooperated in discovery proceedings; (2) rationally evaluated his risks and potential liability; (3) not attempted to unnecessarily delay any of the proceedings; and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party. "If a party has a good faith, objectively reasonable belief that he has no liability, he need not make a monetary settlement offer." *Kalain,* 495 N.E.2d at 574.

■ The record is inadequate for meaningful review on this issue. The reasonableness of defendants' settlement posture can be ascertained from our resolution of their appeal. However, the record does not disclose Preferred RX's settlement posi-

---

9. Though we decide this issue on procedural grounds, we note our reservations regarding defendants' argument. *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984); *Metropolitan Life Ins. Co. v. Neaves,* 912 F.2d 1062, 1065 (9th Cir.1990). It is significant that defendants do not challenge their substantive liability for fraud. Based on the jury's verdict, it cannot be disputed that they "targeted" Preferred RX in Ohio and knew that the results of their conduct would cause injury to Preferred RX in Ohio. Moreover, the fact that the fraud permeated the parties' performance of a lengthy contract distinguishes this case from *Conti v. Pneumatic Products Corp.,* 977 F.2d 978 (6th Cir.1992), on which defendants rely.

tion prior to trial, an essential factor in determining whether prejudgment interest should be available. The district court's resolution of this issue by marginal entry order further hampers review.[10] Accordingly, we remand to allow the court to consider this issue in light of the principles set forth above and Ohio law. We do not retain jurisdiction.

B. Calculation of Amounts Due on American Preferred's Counterclaim

American Preferred filed a counterclaim against Preferred RX for money owed on prescriptions filled by it for Preferred RX's members prior to the termination of the contract. In March 1990, the court granted American Preferred's motion for a preliminary injunction, and ordered plaintiff's agent, North Coast Physicians, to pay American Preferred $549,000. As of the date of trial, this entire sum had not been paid because Preferred RX claimed a right to credits and set-offs. American Preferred raised this issue prior to trial, and the court stated that it would determine the amount remaining to be paid on its order after the trial. The court did so, and entered judgment against Preferred RX for $61,340.90 plus prejudgment interest from the date of the March 1990 order.

On appeal, Preferred RX does not contest the accuracy of the amount of the judgment but, rather, contends that American Preferred abandoned its counterclaim by not litigating it at trial. Preferred RX waived this challenge by not objecting to the court's announcement that it would decide this issue after trial. We thus affirm the judgment against Preferred RX.

We **REVERSE** the judgment against American Preferred Prescription, Inc.; **REMAND** to the district court on the issue of prejudgment interest only; and **AFFIRM** in all other respects.

---

**10.** We reject Preferred RX's suggestion that remand is necessary because the court did not conduct an in-court hearing on its motion. The district court need not conduct such a hearing if the party does not request one, or if it appears to the district court that grounds for granting the

motion do not exist. *Cantrell v. GAF Corp.*, 999 F.2d 1007, 1018 (6th Cir.1993); *Fischer v. Dairy Mart Convenience Stores, Inc.*, 77 Ohio App.3d 543, 602 N.E.2d 1204, 1214–15 (1991); *Novak v. Lee*, 74 Ohio App.3d 623, 600 N.E.2d 260, 265–66 (1991).