**Cynthia HALL, Plaintiff–Appellant,**

v.

**STATE FARM INS. CO., et al., Defendants–Appellants.**

No. 99–1566.

United States Court of Appeals, Sixth Circuit.

Jan. 12, 2001.

Before KRUPANSKY, BATCHELDER, and GILMAN, Circuit Judges.

## OPINION

GILMAN, Circuit Judge.

Cynthia Hall, who is African–American, became an employee of State Farm Insurance Company in 1977. State Farm terminated Hall's employment on December 3, 1996. In the interim, Hall had filed a series of internal complaints with her employer, alleging that she was being subjected to racial discrimination by her immediate supervisors. She also filed two complaints of racial discrimination with the Equal Employment Opportunity Commission (EEOC), one before and one after her termination. In April of 1997, Hall brought suit in federal court against State Farm and three of her supervisors, claiming racial and sex discrimination in violation of federal and state law, as well as a claim for intentional infliction of emotional distress under state law.

The district court granted summary judgment against Hall on her federal claims of race discrimination against her three supervisors, on all of her sex-discrimination claims, and on her intentional-infliction-of-emotional-distress claim. But all of Hall's race-discrimination claims against State Farm, as well as her state-law race-discrimination claims against the individual defendants, proceeded to trial. The jury returned a verdict in favor of all of the defendants, and the district court entered its judgement accordingly. Hall appeals, claiming that (1) the district court erred in its allocation of the burden of proof and (2) the jury verdict was contrary to the law. For the reasons set forth below, we AFFIRM the judgment of the district court.

## I. BACKGROUND

Hall began her employment with State Farm on January 3, 1977. She was promoted or laterally moved to different positions over the next twelve years. In May of 1989, Hall was promoted to the position of Claims Superintendent in State Farm's Madison Heights, Michigan office.

Hall claims that she was first subjected to racially discriminatory treatment in 1986. Sometime in 1988, she filed her first "Open Door" grievance, pursuant to State Farm policy, with personnel supervisor Robert Conley. The grievance alleged that she was receiving discriminatory and disparate treatment in the workplace. While in the position of Bodily Injury (BI) Claims Superintendent in February of 1993, Hall filed her second "Open Door" grievance with David Rost, the Division Manager. Hall complained about the treatment that she was receiving from her immediate supervisor at the time, Robert Schmid, alleging that he acted with hostility toward her and told her that he did not

support her working as a BI Claims Superintendent.

Later, Hall complained that Schmid forced her to involuntarily exchange job duties with his friend, Bill Sutton, a white male who was the Personal Injury Protection (PIP) Claims Superintendent in the Madison Heights office. State Farm had a plan at the time to transfer employees between the BI and PIP units for the purpose of cross-training, but the transfers were to last for three years only. Hall exchanged positions with Sutton and became a PIP Claims Superintendent in August of 1993. After three years, however, instead of returning Hall to her former position as a BI Claims Superintendent, State Farm moved a white male into that slot in March of 1996. Consequently, Hall continued to work in the PIP unit from August of 1993 until her termination in December of 1996.

In the PIP unit, Mary Lollar, a white female, assumed the role of supervising Hall in June of 1994. Although Lollar filed at least one positive review of Hall, Hall claimed that Lollar berated her writing and her work. Hall initiated an "Open Door" grievance to air her complaints regarding Lollar's treatment toward her. According to Hall, this cycle of discriminatory treatment from her supervisors resulted in stress and related chest pains.

James Roderique, a white male, replaced Lollar as Hall's supervisor in the PIP unit in July of 1996. Hall claims that Lollar influenced Roderique to assume a negative attitude toward Hall and that she experienced difficulties with Roderique from the start of their working relationship. For example, Hall claims that she approached Roderique regarding complaints she had been receiving about the performance of Patricia Sebenick, a white female Claims Representative, and was immediately brushed off by Roderique. In-stead, Roderique met with Sebenick and two other white employees and discussed how Hall was creating a hostile environment toward them. Roderique then issued a verbal warning to Hall. In response, Hall submitted an "Open Door" grievance against Roderique and sent it to Division Manager Rost in September of 1996. This memo complained of racially discriminatory treatment that Hall allegedly received from Roderique. Hall did not complain of sex discrimination at the time.

In October of 1996, Roderique issued a series of three written disciplinary memos against Hall regarding her work. Hall then contacted Rost to complain about the perceived retaliatory actions by Roderique. Rost commenced an official investigation into the situation in Hall's unit, assigning Tony Dean, an African–American male employed as a State Farm Human Resources Specialist, to the matter. He received the assistance of Darryl Gilliam, also an African–American male, in conducting the investigation. After interviewing most of the employees who had been supervised by Hall in the State Farm PIP unit, Dean concluded in a report that Hall's concerns were inconclusive, although it was evident that the work environment in Hall's unit was tense. The report further concluded that Roderique's written reports of Hall were legitimate performance management actions.

While Dean's investigation was underway, Sebenick reported her concern to management that Hall was altering claim files. Coincidentally, State Farm was conducting a regularly scheduled review of PIP files, known as a "PIP blitz," when it came across irregularities in a couple of Hall's claim files. The facts regarding the state of Hall's claim files are disputed. According to State Farm, Sebenick reported that Hall requested her to alter the records of payments made on certain

claims. As a PIP Claims Superintendent, Hall was authorized to approve payments up to $50,000. Sebenick claimed that Hall asked her to alter a claim file to reflect that payments under $50,000 were made, when in fact they were over $300,000. Hall responded by claiming that certain irregularities in a number of claim files are not uncommon, and that State Farm conducted an investigation of her files for the sole purpose of building up complaints against her.

Rost authorized a specialized review of more than 200 of Hall's claim files. Concluding that over 30 files contained irregularities, Rost reported to his supervisor, Mark Odland, a State Farm Vice President of Operations. Odland in turn called Regional Audit Consultant Ralph Weber to investigate Hall's files. Weber's investigation concluded that Hall had improperly handled at least two claim files. It also revealed that Hall had authorized fifteen hours of overtime payments for each of two employees in her unit, although each had earned only seven and a half hours of overtime for the period in question. Additionally, Weber reported that Hall apparently used State Farm funds to pay Shamrock Investigations, a State Farm vendor, $2,300 to conduct surveillance on Hall's boyfriend. Finally, State Farm alleges that Hall received personal legal assistance from a State Farm law firm vendor without being charged an attorney's fee. This is contrary to State Farm policy. As for Hall's work performance, State Farm complained that Hall was behind in collecting nearly one million dollars in claims on behalf of State Farm from the Michigan Catastrophic Claims Association.

Although Hall contested the charges against her, State Farm decided to terminate her employment on December 3, 1996 as a result of the totality of the evidence concerning her improper conduct. Hall had filed a complaint with the EEOC less than a month prior to her termination, alleging race-based employment discrimination and retaliatory conduct by her employer. In light of her termination, Hall filed another charge with the EEOC on February 4, 1997, alleging retaliatory discharge. Neither of these complaints alleged sex discrimination.

Hall then filed an action in the United States District Court for the Eastern District of Michigan on April 25, 1997. Hall's complaint alleged wrongful acts of racial and sex discrimination in violation of Title VII, 42 U.S.C. § 2000e, and in violation of ELCRA, Mich. Comp. Laws § 37.2101. Her complaint also included a claim for intentional infliction of emotional distress. Hall sought two million dollars in exemplary and punitive damages, plus costs and attorney's fees.

In March of 1998, State Farm and the individual defendants filed a motion for summary judgment, to which Hall filed a brief in opposition. The district court granted the defendants' motion for summary judgment regarding Hall's Title VII claims of race discrimination against Schmid, Lollar, and Roderique, and on her intentional-infliction-of-emotional-distress claim as to all of the defendants. Furthermore, the district court dismissed Hall's Title VII and ELCRA sex-discrimination claims at summary judgment because Hall failed to assert any basis to show that sex discrimination played a role in the treatment that she received, and because Hall did not allege sex discrimination in her EEOC complaints. The district court denied, however, the defendants' motion for summary judgment on Hall's Title VII and ELCRA race-discrimination claim against State Farm, and on her ELCRA race-discrimination claims as to Schmid, Lollar, and Roderique.

Trial on the merits of Hall's race-discrimination claim began on March 2, 1999. On March 18, 1999, the jury returned a verdict in favor of the defendants on all claims. Hall filed a motion for a new trial. Despite the fact that the motion for a new trial was untimely, the district court explicitly denied Hall's motion on the merits of her claim. This appeal followed.

## II. ANALYSIS

### A. Standard of Review

Hall challenges the jury's verdict, claiming that the district court erred in its instructions regarding the respective parties' burden of proof to establish liability under Title VII. She also contends that the jury's verdict was improper because the jury was prevented from assessing whether Hall was entitled to damages for the discrimination she experienced that was unrelated to her termination. Hall's reply brief makes clear that she does not contest the contents of the verdict form itself, but rather challenges "the jury's response to the inquiries posed on the verdict form."

■ We interpret Hall's statement as a claim that the district court, through its jury instructions, failed to enunciate the correct legal standard. Under Rule 51 of the Federal Rules of Civil Procedure, "[n]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." This court has held that when a party fails to comply with Rule 51, thereby waiving appellate review of the jury instructions, a jury verdict can be reversed only for plain error. *See Preferred Rx., Inc. v. American Prescription Plan, Inc.*, 46 F.3d 535, 547–48 (6th Cir. 1995). Because Hall did not timely object to the district court's statement of the law as set forth in the verdict form, thereby failing to comply with Rule 51, we review the jury's verdict under the "plain error" standard.

### B. The jury verdict form was based on the correct apportionment of the burden of proof under Title VII and ELCRA

Title VII renders it unlawful "for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Michigan's ELCRA also makes it unlawful for an employer to discriminate on the basis of race or sex. *See* Mich. Comp. Laws § 37.2202(1)(a). Hall appeals the district court's judgment on her race-discrimination claim under Title VII against State Farm and under ELCRA against State Farm and her three supervisors. Because ELCRA claims are analyzed under the Title VII framework, the district court's judgment will be reviewed under Title VII standards for both federal and state claims. *See Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999).

■ The Supreme Court established the burden-shifting framework for employment discrimination claims based on circumstantial evidence in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and clarified this framework in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). As a result of these cases, a Title VII cause of action based on circumstantial evidence involves three stages of proof. The plaintiff bears the initial burden of proving a prima facie case of discrimination. *See Burdine*,

450 U.S. at 252–53. If the plaintiff successfully establishes a prima facie case, then the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse treatment. *See id.* at 254. Finally, if the defendant carries this burden, the plaintiff must prove that the proffered reasons were in fact pretextual. *See id.* at 253. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*

The questions articulated in the jury-verdict form correctly reflect the burden-shifting framework of *McDonnell Douglas* and *Burdine.* Questions I(A) and II(A) of the verdict form asked the jury whether Hall had "proved by a preponderance of the evidence" that she was treated differently than similarly situated non-minority employees for the same or similar conduct, and whether the defendants fired her in retaliation for having filed "Open Door" grievances. The jury answered that Hall had met this burden of proof against State Farm, Roderique, and Lollar, but had failed to do so against Schmid.

Hall contends that the above answers established that State Farm and two of her supervisors are liable in damages for discrimination and retaliation. If these had been the sole questions submitted to the jury, we would tend to agree. Read in the context of the remaining jury-verdict questions, however, it becomes obvious that these questions were not intended to determine ultimate Title VII liability for disparate treatment and retaliation, but were simply meant to ask whether Hall had met her burden of establishing a prima facie case.

■ A Title VII plaintiff need only prove by a preponderance of the evidence that she received adverse treatment under "circumstances which give rise to an infer-ence of unlawful discrimination" in order to establish a prima facie case of disparate treatment. *Burdine,* 450 U.S. at 253. As such, the language of Questions I(A) and II(A), when considered in relation to the questions that followed, were apparently intended to describe this prima facie standard.

Questions I(B) and II(B) of the verdict form correspond to the second and third inquiries involved in the framework of *McDonnell Douglas* and *Burdine,* asking whether Hall had "proved by a preponderance of the evidence that the defendants' legitimate, non-discriminatory reasons for terminating her employment were a mere pretext for hiding" discriminatory and retaliatory conduct. The district court instructed the jury that if it found that the defendants had rebutted Hall's prima facie case of discrimination or retaliation, then it could not award Hall any damages.

Responding in the negative to Questions I(B) and II(B) of the verdict form, the jury found that Hall failed to carry the ultimate burden of proving discrimination as required by *McDonnell Douglas* and *Burdine.* State Farm presented evidence at trial that Hall directed subordinates to alter documents, authorized payments to employees who were not entitled to receive them, and engaged State Farm vendors to perform personal services that were billed to the company. In sum, although Hall proved a prima facie case of race discrimination, she did not establish that State Farm and her three supervisors were liable for violating Title VII and ELCRA.

C. Hall's claim for non-economic damages unrelated to her termination

■ Hall's reply brief emphasizes her position that although the jury determined that she established a prima facie case of discrimination and retaliation against State

Farm, Roderique, and Lollar, it never assessed whether she was entitled to non-economic damages for instances of discrimination or retaliation that are unrelated to her termination. Her contention is correct insofar as Parts I(B) and II(B) asked whether Hall proved by a preponderance of the evidence that the defendants' non-discriminatory reasons *for terminating her employment* were nothing more than a pretext for hiding discriminatory and retaliatory conduct.

But Hall raises this objection to the district court's exclusive focus on her termination for the first time before this court. As such, she failed to comply with Rule 51 of the Federal Rules of Civil Procedure, which requires litigants to state objections to a district court's instructions to the jury by the close of the evidence, or else be deemed to have waived any such objection. Because the verdict form as submitted to the jury correctly stated the law as to Hall's burden of proving liability for discriminatory and retaliatory termination from her position at State Farm, we do not find any plain error in the jury instructions. *See Preferred Rx.*, 46 F.3d at 548. Hall's failure to request a specific instruction and verdict question on her claim for non-economic damages unrelated to her termination bars her from successfully raising the issue for the first time on appeal. In addition, at no point in her suit did Hall state a claim for a hostile work environment. *See generally Williams v. General Motors Corp.*, 187 F.3d 553, 560–61 (6th Cir.1999) (setting forth the elements of proof required to establish a hostile-work-environment claim under Title VII).

**D. Hall's case does not implicate a mixed-motive analysis**

■ Hall also claims that the district court should have assigned the burden of proof according to the standard set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). *Price Waterhouse* announced an alternative burden-shifting framework for cases in which an employment decision is the product of a mixture of legitimate and illegitimate motives. *See id.* at 247. That analysis allows defendants to limit liability when a Title VII plaintiff proves that an impermissible factor played a motivating part in an employment decision by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the impermissible factor into account. *See id.* at 258.

State Farm first notes that Hall never objected to the district court's framing of her case under the analysis of *McDonnell Douglas* and *Burdine*. In her reply brief, Hall claims that what she challenges "is the jury's response to the inquiries posed on the verdict form" and not to the verdict form itself. Hall's objections, however, must be recognized as a challenge to the court's charge to the jury. As such, this is another claim that Hall is precluded from raising on appeal due to her failure to comply with Rule 51. *See Preferred Rx*, 46 F.3d at 548.

Moreover, even if Hall had not waived this issue, the record before us does not warrant an analysis under the *Price Waterhouse* framework. The *Price Waterhouse* analysis is reserved for cases where a Title VII plaintiff has established direct evidence of discrimination. *See Price Waterhouse*, 490 U.S. at 277 (O'Connor, J., concurring); *see also Kline v. Tennessee Valley Authority*, 128 F.3d 337, 348 (6th Cir.1997) (explaining that a Title VII plaintiff may establish discrimination either by introducing direct evidence or by offering circumstantial evidence, but that the *Price Waterhouse* framework is appropriate only in the former case to afford

defendants the opportunity to avoid liability). For all other cases that lack direct evidence of discrimination, plaintiffs must carry the ultimate burden of persuasion with circumstantial evidence to establish liability under the framework of *McDonnell Douglas* and *Burdine*. *See id.* at 348–49. At trial, the jury found that Hall's evidence was insufficient to prove that State Farm and her supervisors were liable for discrimination under Title VII and ELCRA. Although Hall's evidence showed that she worked in a tense environment, it did not constitute direct evidence of discrimination capable of shifting her case to a *Price Waterhouse* analysis.

### III. CONCLUSION

For all of the reasons set forth above, we AFFIRM the judgment of the district court.