117 So.2d 419 (1960)
ORKIN EXTERMINATING COMPANY OF SOUTH FLORIDA, INC., a Florida Corporation; Orkin Exterminating Company of Florida, Inc., a Florida Corporation; Taft Pierce and Albert Snyder, Appellants,
v.
TRULY NOLEN, INC., a Florida Corporation, Appellee.
No. 59-12.
District Court of Appeal of Florida. Third District.
January 25, 1960.
Rehearing Denied February 12, 1960.
*420 Walton, Lantaff, Schroeder, Atkins, Carson & Wahl, Miami, for appellants.
Bernard B. Weksler and Joseph Pardo, Miami, for appellee.
PEARSON, Judge.
Truly Nolen, Inc., and Orkin Exterminating Company are competing organizations in the pest control and exterminating business. Truly Nolen brought a complaint seeking an injunction against Orkin and certain of its employees to restrain them from the alleged activity of soliciting, enticing and pirating the employees of Truly Nolen and secondly to require Orkin to pay such damages as the plaintiff may have already sustained in consequence of these alleged activities and such punitive damages as the chancellor might find proper. Orkin denied the allegations of the complaint and an extensive trial was held. The chancellor made extensive findings of fact[1] in his decree, the basic conclusion *421 of which was that Orkin maliciously, wantonly, and unlawfully interferred with Truly Nolen's contracts. The decree enjoined Orkin from further interference with plaintiff's employment contracts and contained judgment for Truly Nolen against Orkin for $7,519.01 actual damages and $75,000 as punitive damages. A judgment of $7,500 as punitive damages against a defendant, Pierce, who was an employee of Orkin, was also entered.
Upon this appeal from the final decree it is first contended that the evidence does not support the finding of malice as a basis for punitive damages. Secondly the chancellor's authority to enter a judgment for punitive damages is challenged, and lastly it is urged that the award of compensatory damages is not supported by the evidence and that the amounts assessed as punitive damages are inordinate. We hold that a chancellor is without authority to enter a judgment for punitive damages and reverse the decree in part.
The Court found further:
"11. That the actual damages suffered by Nolen as a direct and proximate result of the actions of Pierce and Orkin is the sum of $7,519.01.
"12. That the plaintiff is entitled under the law to receive exemplary and punitive damages from the defendants, Pierce and Orkin, in this cause."
Upon appellants' first point, relative to the sufficiency of the evidence to support the chancellor's finding of malice, our review of the record reveals sufficient evidence of economic piracy to support the conclusion of the chancellor that the defendants engaged in such activity. There is evidence that Orkin set out on an economic campaign, which was to some extent successful, to put the plaintiff out of business. We agree with the chancellor that the type of injury resulting may be propitiated only by punitive damages.
We are presented with the argument, however, that it is error for a court of equity to grant punitive damages unless authorized by statute. This is the first time that this court has been called upon to pass directly upon the propriety of awarding punitive or exemplary damages *422 in chancery. Upon several occasions the appellate courts of Florida have approved by implication the allowance of punitive damages by a chancellor. See Florida Ventilated Awning Co. v. Dickson, Fla. 1953, 67 So.2d 215; Fontainebleau Hotel Corp. v. Kaplan, Fla.App. 1959, 108 So.2d 503; Miami Beach Lerner Shops, Inc. v. Walco Mfg. of Florida, Fla.App. 1958, 106 So.2d 233.
A reading of these opinions reveals that the question of the authority of the chancellor to award punitive damages evidently was not raised by the assignments of error and certainly was not passed upon by the court. We therefore hold that the question has not been determined in this state.
A historical background of the question of whether an equity court has the power to award punitive damages is ably set forth in Superior Construction Co. v. Elmo, 204 Md. 1, 102 A.2d 739, 104 A.2d 581, 48 A.L.R.2d 932, 947. A review of the authorities therein set out reveals that punitive damages originated in the law of England where the common conscience of the jury was the basis for the award of the additional amount beyond compensatory damages to the injured party. The weight of authority in this country is definitely against the right of a chancellor to award punitive damages in the absence of express statutory authority to do so. Livingston v. Woodworth, 15 How. 546, 14 L.Ed. 809; Stevens v. Gladding, 17 How. 447, 15 L.Ed. 155; Fleitmann v. Welsbach Street Lighting Co., 240 U.S. 27, 36 S.Ct. 233, 60 L.Ed. 505; Porter v. Warner Holding Co., 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332; Orenstein v. United States, 1 Cir., 1951, 191 F.2d 184; Decorative Stone Co. v. Building Trades Council, 2 Cir., 1928, 23 F.2d 426; Coca-Cola Co. v. Dixi-Cola Laboratories, 4 Cir., 1946, 155 F.2d 59, certiorari denied 329 U.S. 773, 67 S.Ct. 192, 91 L.Ed. 665; Leimer v. Woods, 8 Cir., 1952, 196 F.2d 828; Williamson v. Chicago Mill & Lumber Corporation, 8 Cir., 1932, 59 F.2d 918; United States v. Bernard, 9 Cir., 1913, 202 F. 728; United States v. Hart, D.C.E.D.Va. 1949, 86 F. Supp. 787; United States v. Friedland, D.C.Conn. 1950, 94 F. Supp. 721; Hennessy v. Wilmerding-Loewe Co., C.C.N.D. Cal. 1900, 103 F. 90; Taylor v. Ford Motor Co., D.C.N.D.Ill. 1924, 2 F.2d 473; Moore v. Carr, 224 Ala. 275, 139 So. 269; Littlejohn v. Grand International Brotherhood of Locomotive Engineers, 92 Colo. 275, 20 P.2d 311; Superior Construction Co. v. Elmo, 204 Md. 1, 102 A.2d 739, 104 A.2d 581, 48 A.L.R.2d 932; Fleischer v. James Drug Stores, Inc., 1 N.J. 138, 62 A.2d 383; Dunkel v. McDonald, 298 N.Y. 586, 81 N.E.2d 323; Winthrop Chemical Co. v. Blackman, 159 Misc. 451, 288 N.Y.S. 389; Mid-Continent Petroleum Corp. v. Bettis, 180 Okla. 193, 69 P.2d 346; Bird v. Wilmington & Manchester R. Co., 8 Rich.Eq., S.C., 46; Standard Warehouse Co. v. Atlantic Coast Line R. Co., 222 S.C. 93, 71 S.E.2d 893; Bush v. Gaffney, Tex.Civ.App., 84 S.W.2d 759; Whitney v. Adams, 66 Vt. 679, 30 A. 32, 25 L.R.A. 598, 44 Am.St. Rep. 875; Given v. United Fuel Gas Co., 84 W. Va. 301, 99 S.E. 476; Karns v. Allen, 135 Wis. 48, 115 N.W. 357.
In general the denial to a chancellor of the prerogative of awarding punitive damages is supported in these cases upon one of two theories. One theory, known as the waiver theory, holds that by bringing the action in equity the plaintiff waives the right to punitive damages. The other theory is the awarding of punitive damages is incompatible with equitable principles. In this connection it is frequently said that a court of equity is not an instrument for the punishment of an individual or for the exacting of vengeance.
Inherent in all these decisions, of course, is the thinking of these courts that any different holding would deprive the defendant of his constitutional right of a jury trial before punishment. Also involved is the idea that if the plaintiff has a right to punitive damages then he has an adequate remedy at law.
*423 It is extremely difficult to evalulate and set boundaries upon the amount to be allowed as punitive damages. In actions at law for damages, the amount awarded is limited by the common conscience which is called into play by the jury system. It is not intimated that a chancellor has less of this inherent sense of justice, but his judgment is the judgment of one man and that of the jury is the judgment of many. The right to assess a punitive fine for civil wrongs is best left to the jury. Therefore that portion of the judgment which assesses punitive damages in the amount of $75,000 against Orkin Exterminating Company of South Florida, Inc., and Orkin Exterminating Company of Florida, Inc., and the portion of the judgment which allows punitive damages in the amount of $7,500 against Taft Pierce are reversed.
We are next presented with the argument that there is not sufficient evidence in the record to support the compensatory damages of $7,519.01 assessed by the chancellor. The award is composed of four separate items of allowances[2] as follows:
1. $1,237.38 for the expense of having an outside entomologist attempt to complete *424 a project which supposedly Snyder left incomplete.
2. $2,900 additional salary paid to Churchill by reason of an increase in his compensation after his interview by Orkin.
3. $40 additional salary to Bonkenberg for the same reason.
4. Rental of $1,050 and $2,291.63 paid or to be paid on two branch offices which were closed.
We find no evidence in the record to support the chancellor's conclusion that Snyder had agreed or was obligated to build the special advertising exhibit which is the project referred to. Further it was not demonstrated that the failure of the project (the ants concerned in the exhibit died) was caused by Snyder's absence. The second and third items relate to salary increases given to certain employees allegedly to keep them from leaving. These items are not proper elements of damage because the motive for the raise in pay is immaterial and it is only speculation to say that the employees would have left without the raise. In this instance there is only the statement of the employer to support the connection between the pay raises and the activity of the defendants. Under such circumstances no act of Orkin was the efficient, producing and proximate cause of Nolen increasing their compensation, the absence of which precludes the assessment of damages. See 7 F.L.P., Damages § 9; 9 Fla.Jur., Damages, § 12.
It therefore appears that as to these items there is not sufficient evidence to establish the damages awarded. As to the rentals paid or to be paid on the two branch offices no error is made to appear. We hold that the evidence supports only the latter portion of the award for compensatory damages in the amount of $3,341.63.
In addition to the two points discussed the appellant presents eight others. These have each been examined and considered and we have reached the conclusion that upon these points no error has been demonstrated. In the interest of brevity they are not individually set forth.
In view of the conclusions reached above the decree is affirmed in part and reversed in part. Paragraphs numbered 11 and 12 of the chancellor's summary of his findings are stricken and the decree is reversed as to the provisions contained in the decretal portions thereof numbered 7 and 8, which include as follows: an award of punitive damages to the plaintiff from the defendant, Taft Pierce, and an award of punitive damages to the plaintiff from the defendants, Orkin Exterminating Company of South Florida, Inc., and Orkin Exterminating Company of Florida, Inc. Further the award of compensatory damages included in paragraph numbered 6 of the decretal portion of the decree is reduced from $7,519.01 to the sum of $3,341.63. The cause is remanded to the chancellor with directions to enter an amended final decree in accordance with this opinion. In all other respects the final decree is affirmed.
Affirmed in part and reversed in part.
HORTON, C.J., and CARROLL, CHAS., J., concur.
NOTES
[1] "This Court has reviewed the pleadings and voluminous testimony taken in this cause. It appears from the testimony that Nolen is engaged in the pest control and exterminating business in Dade County, Florida for over ten (10) years and is still engaged in said business. Prior to incorporation, the president, Truly Nolen, had been engaged in the same business for eleven (11) years.

"Nolen provides its services to residences, apartment buildings, hotels, restaurants, etc. through the use and medium of trained pest control service operators. The names, addresses and prices of the customers are not readily or easily ascertainable by competitors.
"The Orkin organization, consisting of a parent and numerous corporate subsidiaries (such as the two defendants here in Florida) is in the pest control and exterminating business, operates on a nationwide basis and has several hundred branch offices. It is a rapidly expending organization opening new branch offices constantly and in Florida requires Florida certified pest control operators for each branch. The officers of the defendant subsidiary corporations are the same officers as the parent corporation with main offices in Atlanta, Georgia. Orkin maintains a large branch office in Miami and elsewhere in Dade County, Monroe County, and Broward County.
* * * * *
"As a direct and proximate result of Orkins actions in taking away Snyder, Milligan and Boerner, all Florida certified pest control operators, Nolen had to close down three branch offices and was unable to obtain qualified licensed personnel to replace the loss of the persons and licenses and keep the offices open. Nolen was unable to find anyone duly qualified to replace Snyder and it is interesting to note that when Nolen did employ one Douglas Downes, a graduate entomologist, after Snyder had been taken away by Orkin, that the defendants Pierce and Orkin enticed and persuaded Downes to quit Nolen and work for Orkin. Although Orkin already had three entomologists in the Dade County area and Nolen had none other than Downes, Downes was taken away by Orkin and is another indication of the manner and method by which the defendants deliberately and intentionally interfered with the contractual relationship between Nolen and its employees. Orkin pirated and took away from Nolen, Pierce, Snyder, Milligan and Downes. It appears from the testimony that an entomologist is important to the operation of a pest control company.
* * * * *
"The evidence and testimony in this cause affirmatively shows malicious, wanton and unlawful interference by Orkin and Pierce with Nolen's employment contracts with its employees and with Nolen's pest control business. The malicious interference with the plaintiff's employees was done for the main purpose of harming the plaintiff's business, and the facts established in this case show a conspiracy for this purpose.
"In the instant case, it is undisputed as shown by the testimony and exhibits that for the proper protection of a company such as Nolen or Orkin engaged in the pest control, exterminating, fumigating and termite control business, the business requires secrecy in connection with the methods and systems employed, and that for the proper protection of the company, it is absolutely necessary and essential that all matters connected with, arising out of, or pertaining to the business of the company, its methods and systems and the names of its customers, the addresses and prices, be kept secret and confidential. It is undisputed that by virtue of employment, the personnel will become possessed of the knowledge of the names, addresses and prices of customers of the employer within the territory worked by the employee and the methods, systems, techniques, processes and formulas employed by the employer. The nature of the employer's business and the training received by the employees are of a confidential and secret nature and should not be disclosed or revealed to any competitor (see employment contracts entered into between Orkin and defendant Pierce and defendant Snyder, plaintiff's Exhibits 12-A and 12-B). That is one of the reasons why restrictive covenants have been inserted into Nolen employment contracts with its employees and the Orkin employment contracts with its employees. The contracts of employment used by Orkin in Florida are similar to the Orkin contracts used by the national Orkin organization which Orkin has asked courts of other jurisdictions to enforce because of the confidential matter, trade secrets, etc."
[2] "At the time Snyder went to Orkin, he was engaged in a particular display project involving live insects at the DuPont Plaza Building in Miami. This project was not completed by Snyder and as a result, Nolen incurred actual expenses for transportation and compensation for a vacationing outside entomologist to attempt to complete the project. The cost as shown by checks accepted into evidence was $1,237.38, (Plaintiff's Exhibits No. 18), but the project was not completed. The $1,237.38 would not have been incurred by the Plaintiff but for the abrupt enticing away of Snyder. Truly Nolen, President of the plaintiff corporation testified, and the court finds that the salaries of one Churchill and Bonkenburg had to be increased by Nolen after the two employees had been solicited and contacted by Orkin and promised `opportunities unlimited'. Churchill received a $100.00 a month increase from Nolen after returning from an interview with the Orkin executives in Atlanta, Georgia, in July, 1956. Orkin solicited Churchill knowing that Churchill had an employment contract with Nolen. The increased salary to Churchill was a direct and proximate result of Orkin's malicious interference with Churchill's contract with Nolen. The expense to Nolen has been $100.00 a month for the period of time from July, 1956, to November, 1958, a period of 29 months, for a total of $2,900.00. (See Nolen's testimony of October 6, 1958, pp. 98-100).

"Another Nolen employee, Bonkenburg, a pest control route supervisor, solicited and contacted by Pierce for employment with Orkin shortly before the plaintiff's complaint was filed, had a written contract with Nolen. Pierce made arrangements for Bonkenburg to travel to Atlanta at Orkin's expense for an interview. In Atlanta, Bonkenburg told Orkin executives the nature of his duties with Nolen. Nolen had to increase Bonkenburg's salary $20.00 per month after his return from Atlanta. For two months, the actual increased expense is $40.00.
"The testimony conclusively established that three of Nolen's six pest control branch offices in the Dade County area had to be closed when Nolen's Florida licensed pest control operators, Snyder, Milligan and Boerner, were enticed away from Nolen to work for Orkin. Orkin is now using the former Nolen employees' pest control licenses for Orkin branch offices in Hollywood, Panama City and Gainesville, Florida.
"Nolen is still paying rent for the two branch offices on Biscayne Boulevard and is not able to utilize them for the pest control purposes for which they were originally rented. The Homestead Branch office has been closed. The rent for the branch office at 741 Biscayne Boulevard, Miami, was $2,500.00 a year and the lease will expire in two more years. The rent for the branch office at 7613 Biscayne Boulevard, Miami, is $85.00 a month and the lease on said branch office does not expire for two and a half years. Nolen has attempted to mitigate both rents, but has only been able to rent the one office at 7613 Biscayne Boulevard for $50.00 a month, making a loss in damages to Nolen of $35.00 per month over the two year period, amounting to $1,050.00. Nolen was able, pursuant to the applicable laws relating to the operation of pest control branch offices, to keep the offices open for 90 days after Milligan, Boerner and Snyder left, but was unable to keep them open without a certified Florida pest control license listed for the branch office. Snyder was taken away from Nolen on October 5, 1957, and Nolen was compelled to discontinue the branch office at 741 Biscayne Boulevard within 90 days from that date, on January 5, 1958. The actual rental damage to Nolen for the closed branch office at 741 Biscayne Boulevard from January 5, 1958, to December 5, 1958, or a period of 11 months, at $208.33 per month, or a total of $2,291.63."