**NOT RECOMMENDED FOR PUBLICATION**

File Name: 20a0591n.06

Case Nos. 19-3051/3052

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| GEORGE A. BAVELIS, | ) | **FILED** |
| Plaintiff-Appellant/Cross-Appellee, | ) ) | Oct 19, 2020 DEBORAH S. HUNT, Clerk |
| v. | ) ) | ON APPEAL FROM THE UNITED |
|  | ) | STATES DISTRICT COURT FOR |
| TED DOUKAS, et al., | ) ) | THE SOUTHERN DISTRICT OF OHIO |
| Defendants-Appellees/Cross-Appellants. | ) |  |

**BEFORE: STRANCH, BUSH, and LARSEN, Circuit Judges**

**JOHN K. BUSH, Circuit Judge.** This appeal arises out of a long-running bankruptcy proceeding of debtor George Bavelis. Bavelis was a successful businessman before the 2008 financial crisis. Bavelis met defendant Ted Doukas around the time his businesses were beginning to struggle in late 2008. Doukas held himself out as a close friend and business associate who could help Bavelis stabilize his finances. Instead, Doukas perpetuated a fraudulent scheme that deprived Bavelis of substantially all of his assets. The two ultimately had a falling out, and Bavelis voluntarily filed for bankruptcy under Chapter 11.

This dispute arises out of non-core adversary proceedings initiated by Bavelis against Doukas seeking to rescind certain assignments and obtain damages for Doukas's fraudulent conduct. The bankruptcy court recommended awarding rescission of the contested assignments, as well as $116,600 under a theory of unjust enrichment and $1 million in punitive damages. The

district court adopted this recommendation with the exception of the $1 million in punitive damages. The district court held that Florida law does not permit an award of punitive damages absent a corresponding claim for compensatory damages, and that the $116,000 award was equitable and not compensatory.

We hold that the district court erred in concluding that Florida law prohibits punitive damages absent a corresponding award of compensatory damages. However, Doukas raises additional arguments that were not fully addressed below that flow from the district court's introduction of Florida's election-of-remedies rule. We think it best for the district court to consider these arguments in the first instance and therefore **VACATE** the district court's judgment as to damages, **AFFIRM** in all other respects, and **REMAND** for further proceedings.

## I.

Bavelis emigrated from Greece in 1958.[1] He became involved in real estate in the early 1970s and started a real estate development company which held interests in, among other things, several gas stations. In 1996, he acquired Sterling Bank with other investors and converted it into a commercial bank chartered by the State of Florida. Bavelis served as director at Sterling Bank and had an executive role in its parent, Sterling Holding, as chairman of the board, president, and CEO.

Through his role at Sterling Bank, Bavelis became acquainted with Mahammad A. Qureshi, who also held interests in gas stations, sometime in the early 2000s. The men decided to join forces, and they created a series of LLCs for the purposes of investing in gas stations and other real estate developments. All told, the two created and held equal (or somewhat equal) interests

---

[1] The facts are taken from the bankruptcy court's earlier decision in *In re Bavelis* (*Bavelis I*), 490 B.R. 258 (Bankr. S.D. Ohio 2013). Bavelis asserts that the factual findings in that case have preclusive effect, and Doukas does not dispute these facts.

in FLOMAQ, LLC ("FLOMAQ"), its successor in interest FLOVEST, LLC ("FLOVEST"), as well as BMAQ, LLC ("BMAQ"), GMAQ, LLC ("GMAQ"), and George Real Estate Holdings, LLC ("George Real Estate") (collectively, the "Bavelis/Qureshi LLCs").

These LLCs held various real estate interests, many of which were financed by debt. Indeed, of all the Bavelis/Qureshi LLCs, only GMAQ and George Real Estate were debt-free. Bavelis had personally guaranteed, or was carrying personal liability for, all of this debt— approximately $21 million between FLOVEST and BMAQ alone. Qureshi had personally guaranteed at least some of the debt. At some point, Bavelis came to believe that Qureshi was not sufficiently contributing to service the BMAQ and FLOVEST debt, and their relationship began to deteriorate.

Bavelis met Doukas in December of 2008 through Sterling Bank. Doukas had purchased real estate encumbered by mortgages held by Sterling, and Doukas was attempting to pressure the bank into buying out his interest. Because Doukas had proved difficult to negotiate with, Sterling employees asked Bavelis to speak with him in the hopes that their common Greek heritage would facilitate negotiations. Bavelis and Doukas did indeed hit it off, and Bavelis soon considered Doukas a close friend, referring to him as his "brother" and regularly inviting him to his home.

By the spring of 2009, Bavelis was struggling to service the debt for the Bavelis/Qureshi LLCs, and Sterling Bank was not performing well because of the depressed housing market in Florida. Doukas agreed to help Bavelis with his financial woes, first and foremost by negotiating with Qureshi on Bavelis's behalf. However, Doukas informed Bavelis that he could negotiate effectively only if Bavelis transferred to him 10% of GMAC (the only LLC at issue here that was not encumbered by debt). Bavelis complied, executing an agreement ("March Agreement")

3

transferring 10% of his membership to a company owned by Doukas with the understanding that Doukas would return the 10% interest after negotiations with Qureshi were complete.

Doukas then informed Bavelis that negotiations with Qureshi had stalled because Doukas did not have a sufficient interest in the LLCs to be able to negotiate effectively. On June 21, 2009, Doukas presented Bavelis with an agreement ("R.P.M. Agreement") in which Bavelis would transfer his 50% interest in GMAQ to another Doukas company, R.P.M. Recoveries, Inc. ("RPM"), in exchange for $50,000. As with the March Agreement, the R.P.M. agreement was made with the understanding that Doukas would return to Bavlis the interest in GMAQ after negotiations with Qureshi completed.

Also in June 2009, Bavelis executed a $14 million promissory note ("QC Note") and loan agreement to another Doukas company, Quick Capital. Although Bavelis signed the promissory note, he did not receive a loan from Doukas; instead, Doukas promised to (1) deposit $80,000 to $120,000 per month in Sterling Bank; (2) work on Bavelis's behalf to resolve the issues with Qureshi; (3) purchase nonperforming Sterling Bank loans; (4) purchase the loans owed by the Bavelis/Qureshi LLCs to alleviate Bavelis's exposure; (5) make certain assets available for Bavelis's use; and (6) help finalize Bavelis's estate planning (even though Mr. Doukas was not a lawyer nor did he have any estate-planning experience). Some but not all of these promises were reduced to writing. The parties executed the QC Note with the understanding that Bavelis would not have to make interest payments and that the note would be returned to Bavelis when the estate planning was finalized.

Doukas failed to fulfill any of his promises to assist Bavelis, and he never returned the QC Note. Instead, Quick Capital attempted to enforce the Note by filing a claim in these bankruptcy proceedings. In an earlier adversary proceeding, the bankruptcy court found that the Note was

voidable because, *inter alia*, it had been fraudulently induced, and we affirmed. *In re Bavelis* (*Bavelis I*), 490 B.R. 258, 312–27 (Bankr. S.D. Ohio 2013), *aff'd* 2013 WL 6672988 (B.A.P. 6th Cir. Dec. 19, 2013) *and* 773 F.3d 148 (6th Cir. 2014).

Under the terms of the QC Note, Bavelis was obligated to pay $58,333.33 per month, but Doukas promised him he would not have to pay. At some point after the note was signed, however, Doukas informed Bavelis over dinner that Bavelis would need to give him two checks for $58,300. Bavelis complied. He later testified that he believed the checks were part of his estate planning, but Doukas maintained that the checks were interest payments under the QC Note.

Throughout the remainder of 2009, the Bavelis/Qureshi LLCs were still carrying substantial debts that Bavelis was struggling to pay. Bavelis and Qureshi discussed the possibility that one would buy out the other's interest in the LLCs, but they failed to reach an agreement. Bavelis's lawyer accordingly recommended that Bavelis file a complaint to dissolve FLOVEST. However, around the same time, Doukas advised Bavelis that he was still in negotiations with Qureshi and indicated that he would be able to reach an agreement if Bavelis transferred to him his 50% interests in the Bavelis/Qureshi LLCs. Bavelis agreed. As with the March Agreement, the R.P.M. Agreement, and the QC Note, the parties agreed that these assignments were temporary and that the interests in the Bavelis/Qureshi LLCs would be returned. On December 16, 2009, Bavelis executed a series of further agreements ("December Agreements") assigning his interests in the Bavelis/Qureshi LLCs to Doukas's company, Nemesis of L.I. Corp. ("Nemesis"). Bavelis did not receive any money or other renumeration for these assignments.

Collectively, between the March Agreement, the R.P.M. Agreement, and the December Agreements (collectively, "LLC Assignments"), Bavelis had effectively assigned to Mr. Doukas and his companies his entire interest in the Bavelis/Qureshi LLCs.

Because the issues with Qureshi were still unresolved, Bavelis signed a complaint in Florida for dissolution of FLOVEST. However, the complaint stated that FLOHIO was a 50% owner of FLOVEST, even though Bavelis had assigned that interest to Doukas. Bavelis's attorney learned of this assignment and became concerned because the complaint in Florida contained a misrepresentation, so Bavelis asked Doukas to return the assignment. Doukas refused and stopped responding to Bavelis. Bavelis realized that Doukas had not intended to perform on his promises or return the various assignments and loan instruments, and their last exchange was in February of 2010.

On June 10, 2010, regulators determined that Sterling Bank was undercapitalized and issued a corrective action directive ordering the bank to become adequately capitalized. When Sterling was unable to comply, the FDIC took over the bank.

## II.

Bavelis filed a voluntary petition for relief under Chapter 11 of the bankruptcy code on June 20, 2010. He filed an adversary proceeding that same day. The operative complaint was filed on June 12, 2014 and brought seventeen counts against a number of individuals and companies, including Doukas and Doukas's various companies (collectively, the "Doukas Defendants").

Count three of the original complaint sought declaratory relief disallowing Quick Capital's claim against the bankruptcy estate to enforce the QC Note. That Count was bifurcated and separately tried in the earlier proceedings. The bankruptcy court found the QC Note unenforceable and disallowed the claim under three alternative theories: (1) payment; (2) failure of consideration; and (3) fraudulent inducement. *Bavelis I*, 490 B.R. at 312–27. The remaining Counts litigated in this proceeding are: One, Two, Four, Seven, Five, Eight, and Ten through Fourteen.

6

Counts One, Two, Four, and Ten were tried together in the Phase I trial.[2] Those Counts sought to rescind the various LLC Assignments and unwind further transfers of those LLCs from Nemesis to another of Doukas's companies, Lefthersis. Counts Five, Seven, Eleven, Twelve, Thirteen, and Fourteen were then tried as Phase II. Those Counts sought damages from the Doukas Defendants under various legal theories.[3] The parties stipulated to the admissibility of the evidence admitted in the *Bavelis I* trial.

Before the Phase I and Phase II trials, the clerk of court entered defaults against several Doukas Defendants—Nemesis, Quick Capital, R.P.M., and Lefthersis—for failure to timely retain counsel. A default had also been entered against Defendant Blair, another Doukas Defendant, for failing to answer the original complaint. All of these defendants ultimately corrected their respective deficiencies (by retaining counsel or filing a responsive pleading) and were permitted to continue to trial.

After the hearings, the bankruptcy court issued its Proposed Findings of Fact and Conclusions of Law. The bankruptcy court recommended granting relief in favor of Bavelis on Counts One, Two, Four, and Eleven, and recommended dismissing the balance of the Counts.

For Counts One and Two, the bankruptcy court recommended that a declaratory judgment be entered in favor of Bavelis that the LLC Assignments were fraudulently induced and should therefore be rescinded. The court also recommended granting rescission of Doukas's subsequent transfers of the LLCs as requested in Count Four. Having found rescission appropriate, the court recommended dismissing as moot the other Counts seeking to invalidate the Assignments.

---

[2] That proceeding followed a hearing regarding a contempt proceeding against Doukas which resulted in an award of fees and expenses as set out in *Bavelis v. Doukas (In re Bavelis)*, 535 B.R. 228 (Bankr. S.D. Ohio 2015).

[3] Count Five sought damages based on tortious interference; Count Seven for breach of fiduciary and duty to act in good faith; Eleven for Fraudulent Inducement/ Promissory Fraud; Twelve for Negligent Misrepresentation; Thirteen for Promissory Estoppel; and Fourteen for Civil Conspiracy and/or Aiding and Abetting. Count Eight sought damages from a separate defendant, Stavato, and is not at issue.

7

As to Count Eleven, the bankruptcy court recommended disallowing most of the requested damages, most notably Bavelis's request to be compensated for the full cost of the bankruptcy proceedings. However, the court recommended awarding Bavelis damages as a result of Doukas's fraudulent inducement of the QC Note and the LLC Assignments. Accordingly, the court recommended two monetary awards: $116,600 (the amount of the two checks issued to Quick Capital) under a theory of unjust enrichment, and $1 million in punitive damages.

The Doukas Defendants objected to the Report and Recommendation on four grounds: (1) the bankruptcy court lacked jurisdiction over the state law claims; (2) the Doukas Defendants were denied their right to a jury trial; (3) neither compensatory nor punitive damages were appropriate; and (4) the fraudulent inducement claim failed for lack of reliance.

The district court held that the bankruptcy court had jurisdiction over the claims and that the defendants had waived any right to a jury trial. *See Bavelis v. Doukas*, No. 2:17-cv-0327, 2019 WL 101916, at *4–8 (S.D. Ohio Jan. 4, 2019). On the merits, the district court held that the LLC Assignments were fraudulently induced and ordered rescission. *Id.* at *11–12. The district court also held that $116,600 was an appropriate award of damages incident to the rescission of the QC Note and Assignments. *Id.* at *13. However, the district court sua sponte held that under Florida election-of-remedies rules, it could not award legal damages because Bavelis had opted for the equitable remedy of rescission. *Id.* It therefore explained that it was upholding the $116,000 award on the basis of unjust enrichment (which Doukas did not challenge), or in the alternative, as an equitable award incident to rescission. *Id.* The district court then sustained Doukas's objection to the award of punitive damages. *Id.* at *14. The court explained that because the $116,000 was awarded under its equity jurisdiction, Florida law does not permit an award of punitive damages. *Id.*

8

Both parties appealed. Bavelis contends that the district court exceeded the scope of review under 28 U.SC. § 157(c)(1) in disallowing the punitive damages based on an argument not raised by Doukas. He also argues that the dismissal of the punitive damages was incorrect under Florida law even if it was within the scope of review.

Doukas filed a cross appeal, asserting that the district court did not have jurisdiction on any of these Florida claims and that the Doukas Defendants were denied their right to a jury trial under the Seventh Amendment.

### III.

28 U.S.C. § 157(c)(1) authorizes the district courts to enter judgment in non-core claims "after considering the bankruptcy judge's proposed findings of fact and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected." "We review a district court's entry of judgment in a non-core proceeding under 28 U.S.C. § 157(c)(1) following a bench trial in the bankruptcy court in the same manner that we would review any bench trial, considering findings of fact for clear error and conclusions of law *de novo.*" *In re Haley*, 601 F. App'x 900, 904 (11th Cir. 2015). The parties do not dispute that Florida law governs the claims at issue. We first consider Doukas's threshold arguments.

### IV.

#### A. Jurisdiction Under 28 U.S.C. § 1334(b)

District courts have jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). "An expansive definition of 'related to' jurisdiction governs § 1334(b)." *In re HNRC Dissolution Co.*, 761 F. App'x 553, 560 (6th Cir. 2019) (citing *In re Wolverine Radio Co.*, 930 F.2d 1132, 1140–41 (6th Cir. 1991)). In creating "related to" jurisdiction, "Congressional intent was 'to grant comprehensive jurisdiction to the

bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate.'" *In re Dow Corning Corp.*, 86 F.3d 482, 489 (6th Cir. 1996) (quoting *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995)).

"The 'usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.'" *Id.* (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984), *overruled in part by Things Remembered, Inc. v. Petrarca*, 516 U.S. 124 (1995)). "An action is 'related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action . . . .'" *Id.* (quoting *Pacor*, 743 F.2d at 994). The action "need not necessarily be against the debtor or against the debtor's property," but there "must be some nexus between the 'related' civil proceeding and the title 11 case.'" *Id.* (quoting *Pacor*, 743 F.3d at 994).

Resolution of the state law claims at issue—the rescission of the LLC Assignments and the award of compensatory or punitive damages—"could conceivably have an[] effect on the estate being administered," *id.* because a favorable ruling would increase the assets available for Bavelis to satisfy the creditors of the bankruptcy estate. Although Bavelis's interest in some of the holding companies may be relatively small, a judgment in his favor would "alter [his] rights [and] liabilities" and is therefore related to the bankruptcy proceeding. *See id.*; *see also Waldman v. Stone*, 698 F.3d 910, 917 (6th Cir. 2012) (holding that disallowance claims and damage awards are related to the bankruptcy because they would "provide assets for his other creditors"). Moreover, the claims at issue here are against a creditor and involve the same matrix of facts as the QC Note that Doukas sought to enforce against the bankruptcy estate. *See In re Wolverine Radio Co.*, 930 F.3d at 1144 (finding claim "related to" bankruptcy in part because the claim was against a creditor of the estate).

Doukas argues that the Florida claims are not "related to" the bankruptcy because the claims are between non-debtors (FLOHIO and the Bavelis Family Trust) and the Doukas Defendants. We reject this argument. Here, the required nexus is met because although Mr. Bavelis himself was not the assignor to some of the LLC Assignments, he had an interest in FLIHIO and the Bavelis Family Trust and would therefore receive a concrete benefit from a favorable ruling on those claims. *See In re Dow Corning*, 86 F.3d at 490–96 (finding claims against non-debtors "related to" bankruptcy because they could result in claims for indemnification and contribution against the debtor and could deplete debtor's insurance policy); *In re Wolverine Radio Co.*, 930 F.2d at 1143 (finding claims "related to" bankruptcy because they could result in indemnification by debtor).

Doukas also contends that a higher standard for "related to" jurisdiction should apply because Bavelis's bankruptcy plan was confirmed before the Phase I and Phase II trials. Specifically, Doukas argues that because a plan has been confirmed, Bavelis needs to show a "close nexus" between the non-core claim and the bankruptcy to establish jurisdiction. He relies on *In re Resorts Int'l, Inc.*, 372 F.3d 154, 168–69 (3d Cir. 2004).

We reject this argument and apply the ordinary "related to" jurisdictional test. First, the Sixth Circuit has "not yet endorsed this 'close nexus' test for narrowed post-confirmation jurisdiction." *In re HNRC Dissolution Co.*, 761 F. App'x 553, 561 n.4 (6th Cir. 2019). Second, and more importantly, the test would not apply to these claims. The complaint in the adversary proceeding was filed before the plan was confirmed and involved pre-petition conduct. *Cf. In re Greektown Holdings, LLC*, 728 F.3d 567, 577 (6th Cir. 2013) (recognizing that "it is possible that a bankruptcy court's 'related to' jurisdiction diminishes somewhat post-confirmation" when

considering a dispute that arose post-confirmation); *In re Resorts Int'l, Inc.* 372 F.3d at 157–58 (applying "close nexus" test to post-confirmation dispute).

The ordinary rule of course is that jurisdiction is determined at the time of filing. *See, e.g.*, *Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 570–71 (2004). Accordingly, the Third Circuit has explained that "confirmation of a bankruptcy plan does not divest a district court of related-to jurisdiction over pre-confirmation claims." *Nuveen Mun. Trust ex rel. Nuveen High Yield Mun. Bond Fund v. WithumSmith Brown, P.C.*, 692 F.3d 283, 294 (3d Cir. 2012); *see also, e.g.*, *In re Bissonnet Invs. LLC*, 320 F.3d 520, 525 (5th Cir. 2002) (stating for jurisdiction under § 1334(b) that "[t]he existence of subject matter jurisdiction is determined at the time of removal."); *Specialty Mills, Inc. v. Citizens State Bank*, 51 F.3d 770, 774 n.5 (8th Cir. 1995); *In re WorldCom, Inc. Sec. Litig.*, 294 B.R. 553, 557 (Bankr. S.D.N.Y. 2003) (rejecting similar argument because "adopting a rule that would divest federal courts of subject matter jurisdiction over actions 'related to' a bankruptcy estate as the confirmation of the reorganization plan grew near would create perverse incentives for the parties to engage in delay and gamesmanship in both the bankruptcy organization and the related litigation").[4] Accordingly, jurisdiction in the bankruptcy court was proper.

## B.     The Seventh Amendment Right to a Jury

Doukas also argues that he was denied his right to a jury when the bankruptcy court conducted a bench trial over these claims. We reject this argument largely for the reasons given by the bankruptcy court.

---

[4] At least one Northern District of Illinois case has applied the contrary rule. *See SG & Co. Northeast, LLC v. Good*, 461 B.R. 532 (Bankr. N.D. Ill. Nov. 21, 2011). Doukas does not rely on this case, and it has been described as an outlier. *See In re WorldCom, Inc. Sec. Litig.*, 294 B.R. at 556. Moreover, the Seventh Circuit applies a much more restrictive test for "related to" jurisdiction than that applied in this and other circuits. *See In re FedPak Sys., Inc.*, 80 F.3d 207, 214 (7th Cir. 1996) (explaining that Seventh Circuit does not apply the *Pacor* test for "related to" jurisdiction). Accordingly, we would not be persuaded by that approach even if Doukas were to rely upon it.

Bavelis does not dispute that the Seventh Amendment provided Doukas the right to a jury for Bavelis's non-core, state-law claims for affirmative relief. *Cf. Granfinanciera, S.A. v. Norberg*, 492 U.S. 33, 55–64 (1989) (Seventh Amendment provides jury right for fraudulent-conveyance claim brought by debtor against noncreditor). However, the right to a jury can be waived. *See Preferred RX, Inc. v. Am. Prescription Plan, Inc.*, 46 F.3d 535, 548 (6th Cir. 1995); *see Waldman*, 698 F.3d at 920 (holding that creditor waived Seventh Amendment jury right for non-core claims seeking affirmative relief). And Doukas waived his rights here.

First, the Doukas Defendants did not file a jury demand until November 27, 2013, more than three years after Bavelis filed the initial complaint in the adversary proceeding. Federal Rule of Civil Procedure 38(b)(1) provides: "On any issue triable of right by jury, a party may demand a jury trial by . . . serving the other parties with a written demand—which may be included in a pleading—no later than 14 days after the last pleading directed to the issue is served . . . ." Doukas did not file a jury demand until Bavelis filed the Second Amended Complaint, by which time the bankruptcy court had already conducted the first trial on the severed claim seeking rescission of the QC Note that established all the facts of Doukas's fraud.

Doukas contends that he preserved his Seventh Amendment rights by filing a jury demand in response to the Second Amended Complaint. However, "[t]he fact that an amended complaint was later filed is of no consequence when no new issues or facts are introduced." *Irvin v. Airco Carbide*, 837 F.2d 724, 727 (6th Cir. 1987) (citing *Las Vegas Sun, Inc. v. Summa Corp.*, 610 F.2d 614 (9th Cir. 1979)); *see also Burche v. Ashland Chem. Co.*, 928 F.2d 404, at *2 (6th Cir. 1991) (unpublished table decision); *Olund v. Swarthout*, 459 F.2d 999, 1000 (6th Cir. 1972) (finding jury right not revived because amended pleading "introduced no new issues into the action"). The Ninth Circuit has explained that a subsequent complaint will not revive a jury right when the

amended complaint "turn[s] on the same matrix of facts." *Las Vegas Sun, Inc.*, 610 F.2d at 620; *see also Allegra Network LLC v. Ruth*, No. 10–10941, 2010 WL 3190870, at *4 (E.D. Mich. Aug. 12, 2010) ("[A] determination of whether a common issue exists rests on whether the claims 'turn on the same matrix of facts, and concern the same general area of dispute.'" (*quoting SEC v. Battenberg*, No. 06–14891, 2009 WL 3498803, at *1 (E.D. Mich. Oct. 29, 2009) (*in turn quoting Cal Scents v. Surco Prods., Inc.*, 406 F.3d 1102, 1109 (9th Cir. 2005)))).

Doukas contends that his Seventh Amendment rights were preserved because the Second Amended Complaint introduced new causes of action, added new facts, and added a new defendant. Indeed, the Second Amended Complaint added factual allegations about Doukas Defendant RPM and the agreement in June 2009 in which Bavelis agreed to transfer to RPM his interest in GMAQ. But even assuming that some Doukas Defendants had a right to a jury to determine these new factual allegations, they waived any such rights by participating in the bench trial without objection. *See Preferred RX, Inc.*, 46 F.3d 535, 548 (6th Cir. 1995) ("The right to a jury trial may be waived by the conduct of the parties, and the courts of appeal to have considered the issue have held that a party waives any right it may have to trial by jury by participating without objection in a bench trial."); *Mensah v. Shepard*, 945 F.2d 404 (6th Cir. 1991) (table) (failure to object to pretrial order providing for bench trial constitutes waiver).

Doukas argues that he preserved the issue by making a statement at the March 18, 2015 scheduling conference that he had not waived his right to a jury trial. After the hearing, Doukas also filed a written copy of this statement on the record.

At that time, Doukas was proceeding pro se because of his difficulty finding and maintaining counsel. After *Bavelis I* issued, the bankruptcy court entered an order to show cause why Doukas's original counsel, Gary Goldstein, should not have his pro hac vice status revoked

for making misrepresentations to the court about the QC Note. Doukas retained Vorys, Slater, Seymour and Pease LLP as interim counsel, but discharged them shortly after. Doukas attempted to retain substitute counsel, but the bankruptcy court denied pro hac vice status. Vorys, Slater, Seymour, and Pease then entered a limited appearance to represent Doukas in a contempt proceeding and withdrew immediately after the hearing. The bankruptcy court then revoked Goldstein's pro hac vice status. Doukas temporarily retained Peterson Conners Fergus & Peer LLP, but that firm withdrew as counsel soon after. Doukas's current counsel then attempted to enter an appearance on his behalf, but the bankruptcy court denied pro hac vice status. Because the Doukas entities had not retained counsel, the bankruptcy court entered defaults against them. Also because of his inability to secure counsel, Doukas appeared pro se at the March 18th hearing where he stated that he was reasserting his right to a jury trial.

However, when he ultimately retained substitute counsel, Doukas never again invoked the Seventh Amendment or made any indication that he wanted a jury trial. To the contrary, Doukas made various filings in advance of the bench trial, such as exhibit and witness lists. Doukas then fully litigated the claims in a bench trial before the bankruptcy court and never asserted that his Seventh Amendment rights were violated. After trial, Doukas filed proposed findings of fact and conclusions of law. The only mention of a jury trial was in a lone footnote stating, without citation: "It should also be noted that Mr. Doukas and the other Doukas Defendants have consistently demanded a jury trial on the issues surrounding Bavelis' non-core, state-law based claims against them and this Court has no basis to deny them such a right." *See* AP 677 at 20 n.5. Seeing that Doukas was possibly attempting to revive the jury-trial issue, Bavelis filed a supplemental brief arguing that Doukas had waived his Seventh Amendment rights. Doukas never filed a response. The bankruptcy court held that Doukas's perfunctory assertion of his jury-trial right via a single

footnote was insufficient to preserve it. We agree. The bankruptcy court had no meaningful opportunity to consider Doukas's contention that the bench trial deprived him of his right to a jury, and we hold that he waived this right by participating in the trial without objection. *See Preferred RX, Inc*, 46 F.3d at 548.

Doukas largely acknowledges this, but contends that after the bankruptcy court scheduled a bench trial, he faced a Hobson's choice—either waive the right to a jury or fail to appear for trial. We disagree. Doukas did not waive his right to a jury by participating in the trial; he did so by participating in the trial without objection. There were multiple issues that had to be resolved to determine whether Doukas had a right to a jury trial, such as whether the Second Amended Complaint introduced enough new facts to grant the right to a trial as to the new allegations, and whether the Doukas Defendants' jury rights were extinguished when the bankruptcy court entered defaults against them. Had Doukas meaningfully asserted this right before the bankruptcy court, that court could have ruled on the issue in the first instance. His failure to do so constitutes waiver.

## V.

Having rejected Doukas's threshold arguments, we now reach the issue of punitive damages. Bavelis first contends that the district court exceeded its statutory scope of review in sustaining Doukas's objection to the punitive damages award. He also contends that the district court was incorrect as a matter of Florida law.

### A.     Scope of Review under 28 U.S.C. § 157(c)(1)

Bavelis argues that the district court exceeded the permissible scope of review under 28 U.S.C. § 157(c)(1) in disallowing the $ 1 million in punitive damages. Specifically, he contends that the district court is only authorized to review "matters to which any party has timely and

specifically objected," *id.*, and that Mr. Doukas did not object to the punitive damage award on the ground that the $116,000 was awarded as equitable relief.

Section 157(c)(1) provides that after a bankruptcy judge makes a recommendation on a non-core proceeding, the district judge will enter a final order or judgment "after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected." *Id.* § 157(c)(1).

Black's Law Dictionary defines "matter" broadly as "[s]omething that is to be tried or proved; an allegation forming the basis of a claim or defense." Bryan A. Garner, *Black's Law Dictionary* (11th ed. 2019); *see also Merriam-Webster's Dictionary of Law* (1996) ("a subject of consideration, disagreement, or litigation: as . . . one or more facts, claims, or rights examined, disputed, asserted, proven, or determined by legal process"). There is no question that Doukas objected to the "matter" of punitive damages.

Moreover, we have no problem finding that Doukas's argument was sufficiently "specific[]" to present the issue for the district court. By objecting to the damages award, the district court was directed to the relevant remedy that was being challenged and to the applicable caselaw on the topic. Indeed, Doukas argued in his objections that compensatory damages were inappropriate and, therefore, punitive damages were also inappropriate because Florida law does not allow punitive damages in the absence of compensatory damages. That loosely tracks the argument adopted by the district court in disallowing punitive damages. *See Bavelis*, 2019 WL 101916, at *14. By virtue of independent legal research, the district court identified what it believed to be the relevant caselaw in resolving Doukas's objections. Rather than a breakdown of the statutory system, this appears to be the normal function of appellate review.

B.      **Availability of Punitive Damages Under Florida Law**

Bavelis argues that the district court erred in holding that, as a matter of Florida law, punitive damages were not available because he sought rescission of the LLC Assignments and QC Note.

To briefly recap, the bankruptcy court in *Bavelis I* disallowed Doukas's claim for $14 million under the QC Note, holding the note invalid for 1) failure of consideration; 2) payment; and 3) fraudulent inducement. It did not consider any claims for damages. In these proceedings, the bankruptcy court invalidated LLC Assignments and awarded damages related to the fraudulent scheme. Specifically, the bankruptcy court awarded $116,600 for the two checks Bavelis wrote to Quick Capital—which Bavelis gave to Doukas either to facilitate his estate planning or as interest payments under the QC note—under a theory of unjust enrichment, s*ee* R. 1-1 at PageID 61–62, and $1 million in punitive damages based on Mr. Doukas's fraudulent conduct in falsely representing that he would return the two checks and that he would return the LLC Assignments. *See id.* at PageID 71.

The district court affirmed the award of $116,600, but with a caveat. The court explained that *Bavelis I* had already established that Doukas fraudulently induced Bavelis to execute the QC Note and LLC Assignments. *Bavelis*, 2019 WL 101916, at *13. The court also explained that *Bavelis I* conclusively determined that the estate planning was not a separate fraud, but rather was intertwined with the QC Note. *See id.* And because Bavelis had opted for rescission, it could not award legal damages under Florida's election-of-remedies law. *See id.* It nevertheless upheld the $116,000 award under its equity jurisdiction as damages incidental to the fraud, which has always been permissible in Florida courts sitting in equity. *See id.* (quoting *Hauser v. Van Zile*, 269 So.2d 396, 398 (Fla. Ct. App. 1972)). Having upheld the $116,000 award under its equity jurisdiction,

however, the district court held that punitive damages were unavailable because Florida law does not allow a punitive damage award absent an award of compensatory damages. *See id.* at \*14.

The parties tacitly agree that the last statement is not correct as a matter of Florida law. In 1989, the Eleventh Circuit certified to the Florida Supreme Court the following question: "In Florida, must a compensatory damages award underlie a punitive damages award in a case in which the jury has made express findings against a defendant?" *Ault v. Lohr*, 538 So.2d 454, 454–55 (Fla. 1989). The court answered in the negative and explained that "a finding of liability alone will support an award of punitive damages 'even in the absence of financial loss for which compensatory damages would be appropriate.'" *Id.* at 456 (quoting *Lassiter v. Int'l Union of Operating Eng'rs*, 349 So.2d 622, 626 (Fla. 1976)). The Florida Supreme Court applied the same principle in *Engle v. Liggett Group, Inc.*, 945 So.2d 1246 (Fla. 2006) to hold that it is impermissible to award punitive damages without first resolving all the elements of liability. *See* 945 So.2d at 1263–64 ("[A] finding of liability is required before entitlement to punitive damages can be determined . . . . A finding of liability necessarily precedes a determination of damages, but does not compel a compensatory award.").[5] Accordingly, the district court erred in holding that Florida law prohibits any award of punitive damages absent compensatory damages.

---

[5] The district court cited two cases from Florida intermediate appellate courts for the contrary rule, but neither is persuasive in light of the two holdings of the Florida Supreme Court. *Rolls v. Bliss & Nyitray*, which preceded *Ault*, simply held that punitive damages are not available for a breach of contract action absent a separate tort. *See* 408 So.2d 229, 238 (Fla. Dist. Ct. App. 1981). On the other hand, *Morgan Stanley & Co. v. Coleman (Parent) Holdings, Inc.* could be read to support the district court's rule. 955 So.2d 1124 (Fla. Dist. Ct. App. 2007). That case involved a case for securities fraud, in which the court vacated an award of compensatory damages because the plaintiffs had failed to introduce sufficient evidence in support of their damages calculation. *See id.* at 1131. The court then vacated the award of punitive damages, reasoning that actual damages are an essential element of a fraud claim. *Id.* at 1132. It distinguished *Ault* on the grounds that *Ault* involved assault rather than fraud. It then distinguished *Engle* (a fraud case) by explaining that *Engle* just "address[ed] the order of proof in determining entitlement to punitive damages." *Id.* at 1133. As the dissent pointed out, it is hard to reconcile this holding with the relevant Florida Supreme Court precedents, *see id.* at 1137 (Farmer, J., dissenting) ("It is not reasonable to read [*Ault*] to mean anything other than that an award of some compensatory damages is unnecessary to find an entitlement to punitive damages."), but, in any event, Doukas agreed with this reading of *Ault* and *Engle* at oral argument and he does not defend that district court's judgment on this ground.

Despite this conclusion, questions remain regarding whether a punitive damages award is proper (and if so, how much), so we think it more appropriate to vacate and remand for further proceedings rather than reverse. Doukas now argues that punitive damages are not available because Bavelis elected the equitable remedy of rescission, and punitive damages are never awardable in claims sounding in equity. Indeed, Florida courts have held that "absent statutory authority, a judge sitting as a trier of fact in an action formally cognizable in equity may not award punitive damages." *Hoppe v. Hoppe*, 370 So.2d 374 (Fla. Dist. Ct. App. 1978) (quoting *Santos v. Bogh*, 298 So.2d 460 (Fla. Dist. Ct. App. 1974)); *see McGuire, Woods, Battle & Boothe, L.L.P. v. Hollfelder*, 771 So.2d 585, 586 (Fla Dist. Ct. App. 2000); *Lee v. WATSCO, Inc.*, 263 So.2d 241, 243 (Fla. Dist. Ct. App. 1972) ("This court has been committed to the rule that a judge sitting as the trier of the facts in an action formally cognizable in equity may not award punitive damages, absent statutory authorization." (citing *Orkin Exterminating Co. of S. Fla., Inc. v. Truly Nolen, Inc.*, 117 So.2d 419 (Fla. Dist. Ct. App. 1960))). *But see Glusman v. Lieberman*, 285 So.2d 29, 30–31 (Fla. Dist. Ct. App. 1973) (surveying law of other jurisdictions and concluding that this rule "is no longer appropriate in Florida"). Rather than rule on the issue, we think it best that the district court address this issue in the first instance because it was not fully considered below. We offer the following observations to guide the further proceedings.[6]

First, the bankruptcy court and the district court assumed that the $116,000 unjust-enrichment award sounded in equity. However, Florida courts have clarified that unjust-

---

[6] Although Doukas did not raise this argument before the district court, we decline to hold that it was forfeited. The district court sua sponte identified the election-of-remedies issue, thus preserving the issue on appeal. *See Raines v. United States,* 898 F.3d 680, 687 (6th Cir. 2018) ("[T]here can be no forfeiture 'where the district court, despite a party's failure to press an argument, nevertheless addressed the merits of the issue.'" (quoting *United States v. Clariot*, 665 F.3d 550, 556 (6th Cir. 2011))). And because election-of-remedies principles, to some extent, undergird the prohibition against punitive damages in actions formally cognizable in equity, *see Orkin*, 117 So.2d at 422 (explaining that "waiver theory" of this prohibition "holds that by bringing the action in equity the plaintiff waives the right to pursue punitive damages"), the issue is properly before us.

enrichment actions were formerly cognizable at law, not equity. *See, e.g.*, *Duty Free Wolds, Inc. v. Miami Perfume Junction, Inc.*, 253 So.3d 689, 697 (Fla. Dist. Ct. App. 2018) (affirming *Commerce P'ship 8098 Ltd. P'ship v. Equity Contracting Co.*, 695 So. 2d 383, 386–87 (Fla. Dist. Ct. App. 1997) (en banc)); *Am. Safety Ins. Serv., Inc. v. Griggs*, 959 So. 2d 322, 331 (Fla. Dist. Ct. App. 2007) (same).

Second, this issue arose in large part because of the district court's holding that legal damages are unavailable because Bavelis had elected rescission of the LLC Assignments. *See Bavelis*, 2019 WL 101916, at *13. However, although Florida courts require that plaintiffs elect between inconsistent remedies, "the election of remedies doctrine applies only where the remedies in question are coexistent and inconsistent." *Barbe v. Villenueve*, 505 So.2d 1331, 1332 (Fla. 1987); *see Encore, Inc. v. Olivetti Corp. of Am.*, 326 So.2d 161, 163 (Fla. 1976) ("[The election of remedies doctrine] does not preclude the use or pursuit of consistent remedies in proper circumstances."); *Williams v. Robineau*, 168 So. 644, 646 (Fla. 1936) ("If the remedies are several and consistent, the election of one does not operate to waive the others."); *see also De Pantosa Saenz v. Rigau & Rigau, P.A.*, 549 So.2d 682 (Fla. Dist. Ct. App. 1989) (allowing plaintiff to elect rescission against one defendant but legal remedies, including punitive damages, against another). And "the so-called 'inconsistency of remedies' is not in reality an inconsistency between the remedies themselves, but must be taken to mean that a certain state of facts relied on as the basis of a certain remedy is inconsistent with, and repugnant to, another certain state of facts relied on as the basis of another remedy." *Klondike, Inc. v. Blair*, 211 So.2d 41, 42–43 (1968); *see Barbe*, 505 So.2d at 1332 (election-of-remedies barred claim for equitable relief because plaintiff had already obtained damages predicated on an "inconsistent factual scenario[]"). The district court should undertake this analysis on remand as to Bavelis's claims for damages.

\*　　\*　　\*

As a final matter, we briefly address Doukas's alternative arguments in favor of affirmance. First, Doukas argues that it is improper for a judge (rather than jury) to determine punitive damages, relying on dicta from Florida courts emphasizing the fact-intensive and values-driven judgments required for a punitive damages award. However, none of these cases holds that a judge cannot award punitive damages in a bench trial. In fact, Florida courts permit just that. *See, e.g.*, *Bailey v. St. Louis*, 196 So.3d 375, 379–92 (Fla. Dist. Ct. App. 2016) (setting out requirements for punitive damages and explaining that the court was required to make those findings because the case was tried without a jury); *Bank of Am., N.A. v. Pate*, 159 So.3d 383 (Fla. Dist. Ct. App. 2015) (mem) (affirming punitive damages awarded by judge for counterclaims to foreclosure claim).

Second, Doukas relies on *In re John Richards Homes Bldg. Co.*, 552 F. App'x 401, 416 (6th Cir. 2013) to argue that bankruptcy courts do not have general authority to impose serious noncompensatory punitive damages. However, reliance on this case is misplaced, because it involved the bankruptcy court's authority to award punitive damages for litigation misconduct during the bankruptcy, not in substantive state-law adversary proceeding. *See id.*

Finally, Doukas suggests that the punitive damage award was improper because the bankruptcy court was biased. Specifically, he argues that it was inappropriate for the bankruptcy court to rule on the punitive damages claim because it was simultaneously considering other claims against him, including sanctions for litigation misconduct. Doukas does not point to any authority for this proposition. Without any evidence of bias or meaningful argument as to why the bankruptcy court could not rule impartially on the punitive damages claim, this argument fails. *Cf. Bailey v. Comm'r of Soc. Sec.*, 413 F. App'x 853, 856 (6th Cir. 2011) (holding that claimant

22

can prevail on theory of ALJ bias only upon "convincing evidence that a risk of actual bias or prejudgment is present").

## VI.

For all these reasons, we **VACATE** the district court's judgment as to damages, **AFFIRM** in all other respects, and **REMAND** for further proceedings consistent with this opinion.